358

Elmer J. Benes and Frances M. Benes, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

E. J. Benes & Company, Inc., Petitioner, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 43843, 43844. Filed May 13, 1964.

*Samuel Byer* and *Emil Sebetic*, for the petitioners.
*William O. Allen*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in the income taxes of the individual petitioners (docket No. 43843) and additions to tax, for the following calendar years in the amounts indicated:

| Year | Deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 293(b) | Sec. 294(d) |
| 1947 | $5,780.30 | $2,890.15 | $416.70 |
| 1948 | 44,068.60 | 22,122.30 | 7,869.04 |
| 1949 | 54,459.10 | 27,229.55 | 9,266.36 |
| 1950 | 7,477.11 | 4,488.56 | 3,645.18 |

The respondent determined deficiencies [1] and additions to tax in the case of the corporate petitioner (docket No. 43844), for fiscal years and in amounts, as follows:

| Fiscal year ended May 31— | Deficiency | Additions to tax under sec. 293(b) |
|---|---|---|
| 1947 | $149.43 | $237.89 |
| 1948 | | 5,826.84 |
| 1949 | 277.21 | 16,120.22 |
| 1950 | | 14,920.34 |

The cases were consolidated for trial.

The issues for decision are:

(1) Do the costs of constructing a residential dwelling house (hereinafter called the County Line residence), portions of which were paid by the corporate petitioner in each of the years involved, constitute income to petitioner Elmer Benes, the president and principal stockholder of said corporation, who has occupied the County Line residence as his home since 1949?

(2) Was the respondent correct in his determination that the individual petitioners constructively received amounts as salary from the petitioner corporation in 1947, in addition to the amounts reported by them as corporate salary for such year? A similar issue respecting the individual petitioners for the year 1948, as to which no evidence was presented at trial and no arguments made on brief, is deemed to have been abandoned by said petitioners.

(3) Are the individual petitioners liable for additions to tax under section 294(d)(1)(A) of the 1939 Code? The respondent (who originally determined that the individual petitioners were liable for addi-

---

[1] An amended return for each of the years involved was filed by the petitioner corporation; and additional taxes were paid at or shortly after the time said amended returns were filed. As a consequence of such payments, which were made in 1951 prior to the issuance of the deficiency notice, the deficiencies have been either eliminated or largely reduced in the case of the corporate petitioner. See sec. 271(a) of the 1939 Code, which defines a deficiency as the excess of total tax imposed by the Code, over the sum of (1) the tax shown by the taxpayer on his return plus (2) the amount previously assessed as a deficiency, minus the amount of rebates to the taxpayer. The additions to tax for fraud are, however, measured by the difference between the total tax imposed and the tax shown on the original return filed by the taxpayer. See *Maitland A. Wilson,* 7 T.C. 395; *Aaron Hirschman,* 12 T.C. 1223; *Frank M. Wiseley,* 13 T.C. 253, reversed on another issue 185 F. 2d 263 (C.A. 6); *Henry Naples,* 32 T.C. 1090.

tions to tax under said section 294(d)(1)(A) and also under section 294(d)(2)) conceded at the trial that petitioners were not liable for additions to tax under section 294(d)(2)—his concession being in accordance with the Supreme Court's decision in *Commissioner* v. *Acker*, 361 U.S. 87.

(4) Are the individual petitioners and the corporate petitioner liable for additions to tax for fraud for each taxable year under section 293(b)?

(5) Are assessment and collection of deficiencies and additions to tax barred by the statute of limitations (1) for the calendar year 1947 in the case of the individual petitioners, and (2) for the fiscal year ended May 31, 1947, in the case of the petitioner corporation?

In addition to the abandonment mentioned in issue numbered (2) above, the individual petitioners are also deemed to have abandoned another issue—respondent's determination that they received interest income of $1,147.27 from the Benes Co. in 1948. No evidence was presented at the trial with respect thereto; and no argument respecting such issue was made in petitioners' brief.

### FINDINGS OF FACT

Some of the facts were stipulated. The oral and written stipulations of facts, together with the exhibits identified in the written stipulation, are incorporated herein by reference.

Elmer J. Benes (hereinafter sometimes called Benes) and Frances M. Benes are, and at all times material hereto have been, husband and wife. They filed a joint Federal income tax return on the cash receipts and disbursements basis for each of the taxable calendar years 1947 through 1950 with the collector of internal revenue at Cleveland, Ohio.

E. J. Benes & Co., Inc. (hereinafter sometimes called the company), is an Ohio corporation with its principal place of business in Cleveland. It kept its books of account on an accrual basis; and it filed a corporate Federal income tax return on such basis for each of its fiscal years ended May 31, 1947 through 1950, with the collector at Cleveland. On July 5, 1951, the company and the respondent executed a consent extending the period of limitations (Form 872), under the terms of which the period of limitations for assessment of any income taxes of the company for its fiscal year ended May 31, 1948, was extended to June 30, 1952.

The company was incorporated in 1946 as the successor to a business theretofore operated by Benes as a proprietorship. Benes has at all times been the president, a director, and owner of 500 of the company's 503 shares of common stock outstanding. Frances Benes was the secretary of the company; but neither she nor any of the other officers took an active part in the company's business operations.

The company, as had the predecessor proprietorship, engaged in the business of a general contractor, constructing offices, warehouses, and factory buildings in the northeastern Ohio area. Its job contracts were of three types: (1) Cost plus a percentage of cost; (2) cost plus a fixed fee; and (3) lump-sum fixed fee. The company owned no construction equipment other than small tools; and most of its work was handled through subcontracts. During the period from 1946 through 1950, the number of workmen on the company's payroll fluctuated, ranging from as few as 1 to as many as 70.

The company's books of account consisted of a general journal and a general ledger. The manner in which the costs incurred in its construction business were recorded in its books of account was as follows. Subcontractors and suppliers of materials were instructed to (and did) submit at least two copies of invoices for work performed and materials supplied; and the company's foremen on the construction jobs submitted each week two copies of payroll time sheets, showing the names of the workmen, the hours they had worked, and the construction jobs on which they had been employed. The company's bookkeeper, following receipt of invoices and payroll time sheets, would make an entry in the general journal to reflect these costs. Such costs were then posted from the general journal to a "job ledger" (a separate section in the general ledger), which was made up of a separate sheet or group of sheets for each construction job in progress (except the construction work on the County Line residence, which is hereinafter described). Each job (except the County Line residence) was also assigned an identifying number. Periodically, billings would be made to the company's customers; and these billings would be recorded in the job ledger, as credits to the respective job accounts. At the end of each fiscal period, the company's bookkeeper would, for each job, add up the credits (representing billings) and deduct from them the total debits (representing the costs charged to the job), and thereby arrive at a net profit or loss for each job. The profits and losses from each individual job were then posted by the bookkeeper to a profit-and-loss account in the general ledger. The net total of the profits and losses for all the jobs represented the company's profit or loss for the period.

In addition to its books of account, the company maintained certain supporting records, consisting of (1) an alphabetical file of suppliers plus a file of payroll sheets,[2] and (2) job folders or files. When invoices or payroll sheets were received, the general practice was to file one copy in the alphabetical file of suppliers, and the other copy in the appropriate job folder. The alphabetical file of suppliers was kept in a filing cabinet located in an outer office occupied by the com-

---

[2] Reference hereinafter to the "alphabetical file of suppliers" will be understood to include the payroll sheets filed therewith.

pany's bookkeeper; and the job folders (with the exception of that for the County Line residence) were kept in a separate filing cabinet, also located in the bookkeeper's office.

In 1946, Benes and his family were residing in a house located on Hemlock Point Road, in Chagrin Falls, Ohio, a suburb of Cleveland. Sometime in 1945 or early 1946, Benes had expressed to the chief of police of the neighboring village of Hunting Valley a desire to live in that village which was one of the most exclusive residential suburbs of Cleveland. The chief of police called Benes' attention to a vacant 20-acre tract of land, situated at the corner of Kinsman Road (referred to in some of the exhibits herein, as State Route 87) and County Line Road in Hunting Valley.

Thereafter, on or about June 7, 1946, Frances Benes contracted to purchase the above-mentioned tract of land at a price of $14,871.50. In August 1946, a survey of the land was made; and title was subsequently closed and transferred to Frances Benes on May 29, 1947. The purchase price of the land was paid by two checks of the company, which were charged to Benes' drawing account and loan account, respectively, on the books of the company. Frances Benes has continued to hold title to the property down to the time of the trial in the instant case. From the time of the acquisition of the 20-acre tract and continuing at least up to 1950, the real property taxes assessed against such property were paid by Benes.

During the period from 1947 through 1950, the company constructed a 25-room residence (the previously mentioned County Line residence) on this Hunting Valley property. All of the costs of construction of said residence were paid by the company. The County Line residence was the only residential building ever constructed by the company up to December 31, 1950.

As hereinabove found as a fact, every construction job undertaken by the company, except one, was assigned a job number and a sheet in the job ledger section of the general ledger. The single exception was in the case of the County Line residence. No job number was assigned to this construction project; nor was there any sheet for it in the job ledger.

The recordation of the construction costs applicable to the County Line residence was handled in the following manner. When invoices or payroll sheets, representing costs incurred on the County Line residence, were received in the company's office, the bookkeeper placed the same on Benes' desk. He would then designate (by writing the job number of one of the company's other construction jobs on the invoices or payroll sheets) to which job or jobs he intended the particular residence costs to be charged. Thereupon, Benes would return such invoices and payroll sheets to the bookkeeper, who would enter said costs in the general journal as expenses of the various jobs being

performed by the company, which Benes had designated. These costs were then posted by the bookkeeper to the job ledger sheets of the jobs designated by Benes and there commingled with the other costs actually incurred on such jobs—all of which were charged off against the income from such jobs.

The reduction in the profits on the respective jobs, as thus accomplished by the charging off of the County Line residence costs, was reflected in reduced profits of the company for each of its fiscal years 1947 through 1950; and these reduced profits per books were in turn reflected in the company's original income tax returns which it filed for these years.

In addition to directing the bookkeeper to charge the costs of the County Line residence to the company's other jobs in the manner just described, Benes also instructed the bookkeeper not to bill the customers for the County Line residence costs which had been charged to the jobs being performed for said customers. Accordingly, in the case of those customers whose jobs were under cost-plus-a-percentage-of-costs or cost-plus-fixed-fee contracts, the bookkeeper placed a notation "Do Not Bill" or "DNB" opposite the journal entry for the County Line residence costs charged to such jobs. No such notations were made where County Line residence costs were charged to jobs under lump-sum fixed fee contracts.

The disposition of invoices from the suppliers and subcontractors who furnished materials and services on the County Line residence, as well as the disposition of the payroll sheets for the company's workmen employed on the residence, was as follows: After Benes had designated the jobs which were to be charged with such costs, one copy of each invoice or payroll sheet was put in a job folder (referred to in the record herein as the "house file"). The house file was not assigned a job number; and it was not kept in the filing cabinet with the job folders for the company's other construction projects. Rather, the house file was at all times kept in a drawer in Benes' desk, which was kept locked at all times when Benes was not present in the office. The record does not establish what was done with the duplicate of such invoices and payroll sheets; but when a revenue agent (Lewitt) sought to locate some of those duplicate copies in 1951, he was unable to find them in the alphabetical file of suppliers where the duplicate invoices and payroll sheets from the company's other jobs were kept.

Pursuant to directions given by Benes, the company's bookkeeper kept a running total of the costs of the County Line residence in the house file, for the purpose of enabling Benes to know at all times the accumulated costs of the house.

The following schedule sets forth a summary of the expenditures for the County Line residence, showing the jobs to which such expenditures were charged on the books of the company:

| Job No. | Name of customer | Job | 1946 | 1947 | 1948 | 1949 | 1950 | Total |
|---|---|---|---|---|---|---|---|---|
| 239 | SPO, Inc. | Heater div. | $150.00 | $465.76 | $1,091.07 | | | $1,706.83 |
| 246 | Eaton Manufacturing | Diesel shop | | 1,605.30 | | | | 1,605.30 |
| 249 | Nickel Plate R.R. | Stamping div | | | 8,200.00 | | | 8,200.00 |
| 251 | Eaton Manufacturing | Stamping div | | 102.17 | | | | 102.17 |
| 253 | Nickel Plate R.R. | Lima warehouse | | | 6,939.76 | | | 6,939.76 |
| 261 | Eaton Manufacturing | Darley Ave. | | | 5,007.23 | | | 5,007.23 |
| 265 | Reilley Tar & Chemical | Repair fire loss | | 63.60 | | | | 63.60 |
| 267 | American Rivet Manufacturing Co | | | 1,126.63 | 4,818.26 | | | 5,944.89 |
| 268 | Eaton Manufacturing | Loading dock | | | 80.05 | | | 80.05 |
| 273 | Diamond Alkali | Yard office | | | 600.00 | | | 600.00 |
| 278 | do | do | | | 462.00 | | | 462.00 |
| 283 | Nickel Plate R.R. | Berg St. warehouse | | | 19,489.11 | | | 19,489.11 |
| 294 | Eaton Manufacturing | E. 67th St. add. | | | 2,685.26 | | | 2,685.26 |
| 299 | Nickel Plate R.R. | Orange Ave. warehouse | | | 26,025.30 | 11,926.51 | | 37,951.81 |
| 319 | Reilley Tar & Chemical | | | | | 23,970.91 | | 23,970.91 |
| 320 | Nickel Plate R.R. | Chicago roundhouse | | | | | 59.25 | 59.25 |
| 349 | Ohio Wesleyan University | Monnet Hall | | | | 29,004.64 | | 29,004.64 |
| 358 | do | Student Union | | | | 29,173.80 | 1,848.37 | 31,022.17 |
| 366 | Burnham Stoepel | Commercial bldg | | | | | 1,801.26 | 1,801.26 |
| 369 | Die Supply Co | | | | | | 45.21 | 45.21 |
| | Selling expense | | | | 7.80 | | | 7.80 |
| | E. J. Benes, personal | | | | 259.35 | 220.37 | | 479.72 |
| | Total | | 150.00 | 3,363.46 | 75,615.19 | 94,296.23 | 3,754.09 | 177,178.97 |

The net profit or loss per the company's books, for each of the jobs to which the costs of the County Line residence were charged, is as shown in the following table:

| Job No. | Name of customer | Profit (or loss) per books |
|---|---|---|
| 239 | SPO, Inc | $5, 516. 20 |
| 246 | Eaton Manufacturing | 5, 829. 33 |
| 249 | Nickel Plate R.R. | 8, 113. 96 |
| 251 | Eaton Manufacturing | 7, 513. 73 |
| 253 | Nickel Plate R.R. | 7, 707. 81 |
| 261 | Eaton Manufacturing | 8, 080. 68 |
| 265 | Reilly Tar & Chemical | 4, 210. 22 |
| 267 | American Rivet Manufacturing Co | (2, 744. 45) |
| 268 | Eaton Manufacturing | 1, 339. 48 |
| 273 | Diamond Alkali | |
| 282 | do | 6, 415. 31 |
| 283 | Nickel Plate R.R. | (3, 523. 60) |
| 294 | Eaton Manufacturing | 6, 090. 79 |
| 299 | Nickel Plate R.R. | (33, 596. 42) |
| 319 | Reilly Tar & Chemical | 472. 06 |
| 320 | Nickel Plate R.R. | 21, 118. 55 |
| 349 | Ohio Wesleyan University | 4, 552. 57 |
| 358 | do | 1, 233. 05 |
| 366 | Burnham Stoepel | (3, 921. 89) |
| 369 | Die Supply Co | 225. 79 |
| | Selling expense | |
| | Total | 44, 633. 17 |

The first County Line residence item charged to the other jobs of the company was an expenditure in August 1946, for the initial survey of the land upon which the residence was thereafter built. The last expense incurred by the company in connection with said residence was in May 1950. The actual construction work on the residence began in April 1948; and it was substantially completed by the fall of 1949.

The construction project identified in the company's books as "Job, No. 369—Die Supply Company," was a factory building erected for Benes in 1949 and 1950 on land which he owned in Cleveland. When the building was completed, Benes leased the same to the Die Supply Co., an unrelated third party. The construction costs incurred by the company on said building were charged to job No. 369 in the job ledger section of the general ledger. Periodically, the costs were billed to Benes by means of a credit in the job ledger sheet for job No. 369 and a corresponding charge to Benes' loan account on the books of the company. In this way, Benes was charged with, and ultimately paid the company for, the costs of the Die Supply building, which totaled $123,329.59.

The plans for the County Line residence were drawn by an architect who was a personal friend and next-door neighbor of Benes and his wife. During the period from 1947 through June 1949, the architect, acting at the request of Benes, prepared approximately 20 different drawings; and on each of said drawings the following legend

appears: "Drawings for Mr. & Mrs. E. J. Benes." Blueprints of these drawings were given by the architect to Benes. Benes and the architect discussed the drawings frequently; Benes never objected to the legend appearing on the drawings; and he never asked that it be changed. Benes never indicated to the architect that the County Line residence was not intended to be his personal residence.

On October 20, 1947, Benes filed with the village of Hunting Valley a plat and floor plan (consisting of nine pages), for the County Line residence, together with an application for a building permit. On each sheet of the floor plan the following legend appears in prominent letters: "Drawings for Mr. & Mrs. E. J. Benes." The application for the building permit contained the following statement:

E. J. Benes being duly sworn deposes and says that he is the owner of the premises described in the foregoing application, and that the answers herein before set forth are true.

This statement was signed by Benes as "Owner"; and the "Owner's Address" was given as Hemlock Point Road, the then residence of Benes and his family.

Based upon the plans which Benes filed with the village of Hunting Valley, a reasonable estimate of the cost of the County Line residence, exclusive of the land, would have been approximately $155,000 (excluding a builder's profit, which normally was 10 percent of the cost of the building). During the period 1946 through 1950, builders in the Cleveland area were not erecting residences costing over $100,000, except under firm contracts for such houses (i.e., as custom-built residences). During said period homebuilders in the Cleveland area were not building residences of such size as speculative investments, hoping to sell the same upon completion.

At or shortly after the beginning of actual construction on the County Line residence, Benes informed one of his office employees that a particular room located adjacent to the master bedroom, would be occupied by the Benes' infant son. Benes further advised the employee that a tiled service room (which Benes called a "mud room") was being built on the first floor, which would furnish a place where Benes' children could kick off their boots as they came from the stable after riding their horses, and thereby keep from tracking mud into the house. Benes also stated to the employee that the kitchen and adjacent utility rooms were to be so laid out as to permit a woman servant of the Benes' to operate efficiently.

On July 1, 1948, a Cleveland fuel oil dealer entered into an agreement with Benes for the sale of an oil-burning furnace to be installed in the County Line residence. The purchaser was identified as "Mr. E. J. Benes, County Line Road, Hunting Valley, Chagrin Falls, Ohio."

The agreement was signed by "E. J. Benes," as purchaser. The oil dealer's salesman, who dealt with Benes personally, had the definite understanding that the County Line residence was to be Benes' personal home. Thereafter, on November 23, 1948, the fuel oil dealer billed "Mr. E. J. Benes, PERSONAL" for the cost of the oil burner. This invoice was paid by the company and charged to one of the company's other construction jobs (a warehouse being constructed for the Nickel Plate Railroad).

Subsequently, in January 1949 (11 months prior to Benes' occupancy of the residence), the same fuel oil dealer sold 1,509 gallons of heating oil to Benes, which was delivered to the County Line residence. The invoice for such oil was addressed to Benes and it was paid by the company and charged to Benes' personal account in the company's books.

During the period extending from the fall of 1948 through May 1949, Benes negotiated with a Cleveland business firm with respect to the installation of metal cabinets, counter tops, and stainless-steel bowls in the kitchen of the County Line residence. During the course of the negotiations, Benes submitted to said firm a blueprint prepared by Benes' architect, bearing the legend "Drawings for Mr. & Mrs. E. J. Benes." On May 31, 1949, Benes had his secretary type up a written order for the purchase of the kitchen equipment, which he signed. The order directed that the equipment be delivered to the County Line residence; and it stated that the equipment was "for the residence of E. J. Benes." Pursuant to the order, the kitchen equipment was installed in the County Line residence. In late July 1949, the company paid for the equipment; and it charged the cost thereof ($2,100) to another construction job (a residence hall being constructed for Ohio Wesleyan University).

At some time prior to July 11, 1949, Benes solicited a bid from an interior decorator, covering the painting and papering of the County Line residence. The decorator discussed the details of the decorating scheme with both Benes and his wife; and on July 11, the decorator prepared a "take off sheet" which he used for the purpose of preparing the requested estimate. In said "take off sheet," one room in the house was listed as "Jimmy's room." The name "Jimmy" referred to the Benes' infant son. Subsequently, later in July and in September, the decorator submitted estimates to Benes for the interior decoration of the County Line residence, both of which also contained references to Jimmy's room. Said decorator was awarded the job; and he was paid $3,000 for his work by the company, which charged such expense on its books to a construction job for Ohio Wesleyan University.

On September 24, 1949, Benes filed with the village of Hunting Valley, a second application for a building permit, this one seeking

permission to transport a stable from Benes' then residence on Hemlock Point Road, to be placed on the grounds of the County Line residence. In this application, Benes again represented under oath that he was the owner of the County Line residence. Accompanying the second application was a plat of the property, showing the location of the stable. The plat contains the following legend which was printed thereon by Benes himself: "Proposed location of barn at residence of E. J. Benes, County Line Road, Hunting Valley, Ohio."

In the fall of 1949, Benes and his wife listed their Hemlock Point Road residential property for sale, but the County Line residence was never listed for sale with a realtor. In April 1950 an agreement to sell was entered into by and between Benes and his wife and a couple named Newell, under the terms of which Benes and his wife were to be paid $36,389.65 for the Hemlock Point Road property. Benes and his wife received a downpayment of $3,000 on or about April 10, 1950, and an additional $11,389.65 on or about June 5, 1950. The balance of the purchase price was represented by a purchase money mortgage for $22,000 dated April 17, 1950. Title to the Hemlock Point Road property was closed and transfer of the same was completed on June 5, 1950.

In December 1949, Benes and his wife and their four children moved into the County Line residence, although it was not yet fully completed; from then and until the time of the trial in the instant case, they have continuously occupied the same as their personal residence. The County Line residence is two stories in height. On the first floor, it has a guest's room with bath; and on the second floor it has four bedrooms, four baths, a large "sitting room," and two rooms for servants' quarters. Petitioners' three older children occupied three of the second-floor bedrooms; and Benes and his wife occupied the fourth, or master bedroom. Their infant son, Jimmy, occupied the sitting room as his bedroom. At least when the Benes' family moved into the County Line residence, there were servants occupying the servants' quarters. Subsequently, Benes' mother-in-law came to live with the family; and she has occupied the servants' quarters.

During the period from December 1949 to May 1951, neither Benes nor his wife either paid any rent to the company for the use of the County Line residence or made any payment to the company for the purchase price of said residence.

In February 1950, shortly after Benes and his family had moved into the County Line residence, an internal revenue agent, Morris A. Nisenson, conducted an audit of the company's Federal income tax return for its fiscal year ended May 31, 1948. Nisenson is and was a certified public accountant, and he had served as an internal revenue

agent for approximately 4½ years prior to said examination. Nisenson examined the company's general journal and the general ledger during the course of his audit which lasted 1½ days, but his examination did not reveal the existence of the County Line residence. He was not advised of the existence of such residence; nor was he shown the above-mentioned house file that contained invoices and payroll sheets for materials and labor that the company had charged to other jobs in constructing said residence. At the termination of his examination, agent Nisenson determined that the company's return for fiscal 1948 should be accepted as filed, without any change.

The company's returns for fiscal 1948 through 1950 had been prepared by a certified public accountant named McQuilkin, on the basis of information supplied to him by the company's bookkeeper, without independent audit of the company's books and records. At the times these returns were prepared, McQuilkin did not know of the existence of the County Line residence, or of the house file pertaining thereto.

In April 1951, Benes, for the first time, disclosed to McQuilkin the existence of the County Line residence and the house file. Benes informed McQuilkin that the costs of constructing the County Line residence had been charged to other jobs on the company's books, thereby causing an understatement of the company's net income on its books and on its tax returns. Benes stated to the accountant that these facts were causing him loss of sleep and injury to his health. McQuilkin advised Benes of the possibility of the imposition of criminal penalties for tax evasion, as well as civil penalties for fraud; and he recommended that amended returns be filed for the company for the years 1947 through 1950, wherein the residence would be treated as having been purchased by Benes from the company. Benes agreed to McQuilkin's recommendation; and thereafter, on May 8, 1951, amended returns were filed for the company for each of its fiscal years 1947 through 1950.[3] These amended returns were prepared by the accountant McQuilkin, who used the house file that Benes had supplied to him. Said amended returns showed an increase in the company's sales income for each year, equal to the total amount of construction costs of the County Line residence, paid or incurred by the company in each year, as determined by McQuilkin from data in the house file. Said returns were prepared on the theory that as the house was built for Benes, an account receivable from Benes (shown in Schedule L balance sheets attached to each return merely as "Advances") was steadily accumulating. The following table shows

---

[3] No amended returns for the calendar years 1947 through 1950 were ever filed by the individual petitioners Elmer and Frances Benes.

the balances of the "Advances" at the end of each of the years, as shown in said balance sheets:

| Fiscal year ended May 31— | Balance of "advances" |
|---|---|
| 1947 | $614. 76 |
| 1948 | 31, 283. 36 |
| 1949 | 105, 956. 19 |
| 1950 | 177, 178. 97 |

The amended returns of the company reflected additional tax due from it, as follows:

| Fiscal year ended May 31— | Additional tax due |
|---|---|
| 1947 | $326. 34 |
| 1948 | 11, 653. 68 |
| 1949 | 31, 963. 23 |
| 1950 | 30, 635. 54 |

The foregoing amounts of additional tax shown on the amended company returns were paid, either at the time the amended returns were filed or a short time later.

Thereafter, on May 31, 1951, McQuilkin prepared a journal entry for the company's books, reflecting receipt of a note receivable of $177,178.97 from Benes, which entry was recorded in the company's books by its bookkeeper.

In January 1951, prior to the foregoing disclosures by Benes to McQuilkin, the company's return for fiscal 1950 was assigned to an internal revenue agent, Harold Sullivan, for audit. Sullivan did not actually commence examination of said return until about May 1; and he had by that time been alerted by an informer's letter to the existence of the County Line residence and to the possibility that it might have been charged off to expense on the company's books.

On or about April 30, 1951, agent Sullivan contacted McQuilkin for the purpose of making arrangements for an examination of the company's books and records. McQuilkin, who at the time knew of the existence of the County Line residence and who had the house file, did not advise agent Sullivan of the existence of either, because he believed that such a disclosure might incriminate his client, Benes. On the next day, May 1, agent Sullivan went to the company's office for the purpose of making his examination; and while there he conferred with Benes. Agent Sullivan stated to Benes that he understood that Benes had built a new home; and Benes replied that he had. Agent Sullivan thereupon asked Benes how he had financed it. To which inquiry Benes replied that the home had cost between $80,000 and $100,000, which he had raised in part by selling his old residence for around $30,000, and that he had borrowed the remaining funds, none of which he had borrowed from the company.

Agent Sullivan's examination extended throughout the day of May 1, during which he examined both the general journal and the general ledger of the company. He was not advised of the decision that had been made by Benes to file amended returns, or of the existence of the house file, or of the fact that the construction costs applicable to the County Line residence had been charged off as expenses on the company's books and Federal income tax returns. At the end of the day, agent Sullivan stated to Benes that he would probably give the company a "clean bill of health." Thereafter the agent did file a "no change" report which was withdrawn before it had been finally approved, when Sullivan's superiors turned over to him the above-mentioned amended returns that had been filed by the company. In late June 1951, agent Sullivan recommended that the company's returns for each of its fiscal years 1947 through 1950, as well as the individual returns of Elmer and Frances Benes for the calendar years 1947 through 1950, be turned over to the Fraud Squad of the Income Tax Division and the Intelligence Division of the Cleveland collector's office, for a joint investigation.

Thereafter, on August 2, 1951, another internal revenue agent, Ben Lewitt, interviewed Benes in the latter's office. During the course of the interview, Benes stated to Lewitt that he had made a serious mistake with reference of omission of income from the company's tax returns; that it was the only mistake he had ever made; that worry had led him to file the amended returns; and that agent Sullivan had made no inquiry as to how Benes had financed construction of the County Line residence. Also during the course of the same interview, agent Lewitt asked Benes if he had intended to repay the money at the time he had caused the amounts to be charged as expenses of the company's construction jobs for its customers. To this question, Benes replied only "That is a leading question. It was a big mistake."

Benes instructed the accountant McQuilkin to turn over the house file to agent Lewitt; and this was done. Upon an examination and analysis of the contents of the house file, the agent determined that the actual cost of constructing the County Line residence was $173,568.36, rather than $177,178.97 as determined by McQuilkin and reported in the company's amended returns. The cost of the County Line residence, as determined by agent Lewitt, consisted of the following:

| | |
|---|---:|
| Materials, subcontractors, and miscellaneous | $114,341.03 |
| Labor | 56,782.23 |
| Insurance | 2,445.10 |
| | 173,568.36 |

Among the items causing the difference between the total cost of the County Line residence as determined by agent Lewitt and the greater total cost determined by the accountant McQuilkin were three items paid by the company in August 1949, October 1949, and March 1950, for repair and redecoration of the Benes' former residence on Hemlock Point Road, which had been charged to expense on a construction job performed by the company for Ohio Wesleyan University.

Benes and his wife had, by March 12, 1951, accumulated in a savings account $16,062.45 representing the downpayment and monthly payments on the mortgage by the purchaser of the Hemlock Point Road property. On March 27, 1951, Benes withdrew $16,000 from said account which he invested in a new business venture, the Allied-Benes Co., an Alabama corporation formed to engage in construction work in Birmingham, Ala. Benes did not withdraw any amount from said savings account at any time for use in discharging the liability shown owing by him to the company on its books as a note receivable.

On May 31, 1951, a credit of $17,727.64 was made by the company's bookkeeper to the Benes' "Note Receivable" account. Thereafter, payments were made by checks of Benes to the company on the following dates and in the following amounts:

| Date: | Amount |
|---|---|
| July 3, 1951 | $35,000.00 |
| July 16, 1951 | 12,090.35 |
| July 31, 1951 | 6,856.34 |
| Sept. 28, 1951 | 20,000.00 |
| Mar. 11, 1952 | 10,000.00 |
| May 14, 1956 | 72,000.00 |
| Total | 155,946.69 |

Each of said payments was credited on the books of the company to Benes' "Note Receivable" account.

On September 13, 1955, Benes was indicted under section 145(b) of the 1939 Code, on three counts, for willfully attempting to evade and defeat his individual income taxes for each of the years 1947 through 1949. On the same date, Benes was also indicted under section 145(b) on three counts, for willfully attempting to evade and defeat the income taxes of the company for each of its fiscal years ended May 31, 1948 through 1950. Thereafter on September 15–25, 1958, Benes was tried on three counts of alleged evasion of his individual income taxes. The jury returned a verdict of not guilty on the first count (1947); but they returned a verdict of guilty on each of the second and third counts (1948 and 1949, respectively). Benes appealed his conviction for evading his individual income taxes to the Court of Appeals for

the Sixth Circuit. That court reversed the conviction for the year 1948 on the ground that the prosecution for said year was barred by the statute of limitations. Also it reversed the conviction for 1949 on the ground that the trial judge had made a faulty charge to the jury; and remanded the case for a new trial as to said year 1949. (See *Benes* v. *United States*, 276 F. 2d 99 (1960).)

Between September 13, 1955, and December 3, 1962, there was no trial held under the indictment charging Benes with evasion of the company's income taxes. On the latter date, Benes entered a plea of *nolo contendere* to count three of the indictment charging evasion of the company's taxes. At the same time, the remaining counts of both indictments were dismissed pursuant to the motion of the U.S. attorney. On December 7, 1962, the District Court imposed a fine of $10,000 on Benes.

### Facts re Company's Earnings and Profits

The following statement is an analysis of the earnings and profits of the company during each of its fiscal years 1947 through 1950, as stipulated by the parties in the instant case. The computation of its earnings and profits, as reflected therein, does not contain any reduction in earnings and profits for dividends or other corporate distributions by the company to or for Benes, other than dividends formally declared and paid in cash.

*E. J. Benes & Co., Inc., Analysis of Earnings and Profits*

| | Fiscal year ended May 31— | | | |
| --- | --- | --- | --- | --- |
| | 1947 | 1948 | 1949 | 1950 |
| Earnings and profits at beginning of year_____ | $0 | $23, 665. 40 | $68, 320. 53 | $112, 712. 24 |
| Add: | | | | |
| Net income for year: | | | | |
| Per original returns_____ | 44, 198. 89 | 53, 909. 86 | 23, 750. 48 | 23, 622. 25 |
| Adjustments on examination _____ | 897. 70 | 30, 667. 59 | 75, 402. 31 | 69, 131. 03 |
| As adjusted_____ | 45, 096. 59 | 84, 577. 45 | 99, 152. 79 | 92, 753. 28 |
| Total_____ | 45, 096. 59 | 108, 242. 85 | 167, 473. 32 | 205, 465. 52 |
| Less: | | | | |
| Dividends paid in cash_____ | 5, 030. 00 | 7, 545. 00 | 10, 060. 00 | 2, 515. 00 |
| Federal income taxes: | | | | |
| Per original return_____ | 15, 925. 42 | 20, 485. 75 | 5, 437. 62 | 5, 405. 57 |
| Additional: | | | | |
| Assessed in 1951_____ | 326. 34 | 11, 653. 68 | 31, 963. 23 | 30, 635. 54 |
| Not assessed_____ | 149. 43 | _____ | 277. 21 | (794. 86) |
| As adjusted_____ | 16, 401. 19 | 32, 139. 43 | 37, 678. 06 | 35, 246. 25 |
| Sec. 293(b) addition to tax of preceding year_ | _____ | 237. 89 | 5, 826. 84 | 16, 120. 22 |
| Unallowable deduction: Cost of operation disallowed_____ | _____ | _____ | 1, 196. 18 | _____ |
| Total reductions_____ | 21, 431. 19 | 39, 922. 32 | 54, 761. 08 | 53, 881. 47 |
| Earnings and profits at end of year_____ | 23, 665. 40 | 68, 320. 53 | 112, 712. 24 | 151, 584. 05 |

*Facts re Constructive Receipt of Compensation*

At the first meeting of the company's board of directors, held on May 28, 1946, the directors voted to compensate Benes as president of the company, in accordance with the following formula:

$12,000 per annum, plus:
  a. 25 percent of the net profits of the Company between $25,000 and $50,000; plus
  b. 15 percent of the net profits of the Company between $50,000 and $75,000; plus
  c. 10 percent of all net profits of the Company in excess of $75,000 per annum.

The foregoing compensation arrangement remained in effect until January 24, 1948, when changes were made in the percentage-of-profits portion of Benes' compensation.

In the company's first fiscal year ended May 31, 1947, it credited Benes with a total salary of $17,801.59, consisting of $12,000 basic salary, plus $5,801.59 computed at the year's end in accordance with the percentage formula above set forth. The company deducted said amount of $17,801.59 on its return for fiscal 1947.

For the company's fiscal year ended May 31, 1948 (which included the 7-month period of June through December 1947), it credited Benes with a total salary of $30,984, consisting of basic salary of $1,000 per month ($12,000), plus $18,984 computed at the year's end in accordance with the revised percentage-of-profits formula adopted in January 1948.

Benes, on the joint income tax return which he and his wife filed for calendar 1947, reported compensation received from the company in 1947 of only $8,982.31.

At the same board of directors' meeting above mentioned, the directors voted to pay Benes' wife, Frances, $600 per year as salary for services as secretary of the company. The company credited Frances with $600 salary on its books of account, and deducted said amount on its return for fiscal 1947; and it did the same for fiscal 1948. Frances did not report any amount as salary received from the company on the return which she joined with her husband in filing for calendar 1947.

The total amount of gross income which was reported on the joint return for 1947 filed by Benes and his wife was $14,572.31.

At all times throughout the periods here involved, Benes acting in his capacity as president signed all of the checks issued by the company; and he had full power and authority to withdraw funds from the company without securing the permission of any other person

The balance sheet of the company, as of May 31, 1947, which was appended to its return for fiscal 1947, shows cash on hand and in banks of $49,876.32.

## Facts re Respondent's Adjustments

Regarding the individual petitioners Elmer and Frances Benes, the respondent determined, respecting the issues still involved herein, that Elmer had received "other income" from the company in each of the taxable years in the following amounts:

| | |
|---|---|
| 1947 | $3, 363. 46 |
| 1948 | 75, 358. 22 |
| 1949 | 91, 994. 74 |
| 1950 | 3, 754. 09 |

The amount so determined for each year represents construction costs applicable to the County Line residence paid or incurred by the company, or expense items respecting the Hemlock Point Road property (Benes' former residence) which were paid or incurred by the company [4]—all of which were charged to other construction jobs in the company's books and deducted on its returns.

The respondent also determined that Elmer and Frances Benes had realized "additional salary income of $9,419.28 [from the company] which was not reported in your 1947 income tax return."

Respondent further determined that the individual petitioners were liable for each of the years 1947 through 1950 for additions to tax for fraud under section 293(b); and that they were liable for additions to tax under section 294 (d)(1)(A) and (d)(2) for failure to file estimates of estimated tax and for substantial underestimate of estimated tax, respectively.

Regarding the corporate petitioner, the Benes Co., the respondent determined that it was liable for additions to tax for fraud under section 293(b) for each of its fiscal years ended May 31, 1947, through 1950.[5]

#### ULTIMATE FINDINGS OF FACT

The amounts paid or incurred by E. J. Benes & Co., Inc., for the labor and materials and subcontractors' services that went into the construction of the County Line residence, were intended at the time when paid or incurred, to provide a personal, private residence for the company's president and chief stockholder, Elmer J. Benes, and the members of his family.

At no time during the taxable years involved did Elmer Benes intend to pay the company for the costs which it paid or incurred in erecting the County Line residence.

---

[4] During 1949, the company paid $594.15 for items attributable to the Hemlock Point Road property; in 1950, the amount was $458.

[5] The respondent also made adjustments to the sales income and the cost of goods sold of the corporate petitioner for each of its taxable fiscal years here involved. The net effect of these adjustments was to bring said petitioner's taxable net income for each such year, as determined by the respondent, into substantial agreeemnt with the taxable net income reported by the petitioner in its amended returns.

The deficiency in income tax due from the individual petitioners, Elmer and Frances Benes, for each of the calendar years 1947 through 1950 is due in major part to fraud with intent to evade tax within the meaning of section 293 (b) of the 1939 Code.

The deficiency in income tax in the original income tax return of E. J. Benes & Co., Inc., for each of its fiscal years ended May 31, 1947 through 1950, is due in major part to fraud with intent to evade tax within the meaning of section 293 (b) of the 1939 Code.

In their joint income tax return for 1947, Elmer and Frances Benes omitted an amount from gross income which was in excess of 25 percent of the gross income stated in the said return.

The income tax return filed by the individual petitioners, Elmer and Frances Benes, for each of the calendar years 1947 through 1950 was false or fraudulent with intent to evade tax within the meaning of section 276 (a) of the 1939 Code.

The original income tax return filed by petitioner E. J. Benes & Co., Inc., for each of its fiscal years ended May 31, 1947 through 1950, was false or fraudulent with intent to evade tax within the meaning of section 276 (a) of the 1939 Code.

OPINION

*I*

The first issue for decision is whether petitioner Elmer J. Benes derived taxable income to the extent that the E. J. Benes & Co., Inc., of which he was president and for all practical purposes sole stockholder, paid the construction costs of the County Line residence which Benes and his family have occupied ever since December 1949 as their personal residence.

Benes contends that he caused the company to undertake construction of the residence solely in order to provide a construction job where laborers (which he claims were in short supply) could be utilized by the company at times when they were not needed on the company's construction jobs which it was performing for its customers. Benes claims that his and the company's intention was to sell the County Line residence when it was completed; that it was only when he ascertained that the residence could not be sold for more than about half of the total costs of erecting said residence that he determined to move his family into the house and occupy the same; and that it was only when the Hemlock Point Road house (which he and his family had occupied as a residence until December 1949) was sold and title transferred in June 1950, that he determined to acquire the County Line residence property, at which time he also formed the intention of paying the company for the house.

Petitioner Elmer Benes' protestations to the contrary notwithstanding, we think that his intention from the very beginning was that the County Line residence was to be his own personal residence, and that he had no intention, prior to May 1951, to ever pay the company for constructing it.

The following are but some of the factual indications appearing from the record herein of an *ab initio* and continuing intention on the part of Benes for the County Line residence to be his residence: (1) The desire to live in the village of Hunting Valley, the location of the property, which he himself expressed in 1945; (2) the purchase of the land shortly thereafter, with title taken in the name of Benes' wife; (3) Benes' personal payment of the real estate taxes accrued against the property throughout the period when the residence was being constructed; (4) the legend appearing on each of the numerous architectural drawings, "Drawings for Mr. & Mrs. E. J. Benes"; (5) representation to the village authorities on two occasions that he, Benes, was the owner of the property; (6) representation to the companies that supplied the sinks, counter tops, and cabinets for the kitchen, and the oil furnace, that the County Line residence was the residence of E. J. Benes; and (7) the removal of the stable from the Hemlock Point Road property (the former Benes' residence) to the County Line road property.

Benes' contention that the County Line residence was conceived and erected as a means for employing temporarily idle labor to build an asset for the company which it could ultimately sell, is, in our opinion, an afterthought, at least as far as the residence being built as a company asset is concerned. Conceivably, it could have been a "make-work" project insofar as utilizing labor is concerned; but we think that the labor was engaged to build a residence for the company's president rather than an asset for the company.

Factual indications of a lack of intention to pay for the residence, prior to May 1951, are at least three. First there is the contrasting manner in which the project known as the Die Supply Co. job was handled. It will be recalled that this was a building which Benes had the company erect, admittedly for him, and which he intended to pay for. The costs of erecting this building were charged, on the books of the company, to Benes' loan account. The inference which we draw is, that if Benes had intended to pay for the County Line residence, he would have had the company charge him therefor. Clearly he knew how this should be done. The second indication is Benes' concealment of the house file, wherein were contained copies of invoices and payroll sheets that showed the costs incurred in erecting the County Line residence. The third indication is, that he in fact made no move to pay the company anything until May 1951, 18 months

after he and his family had moved into the residence—and then, we think significantly, only after the amended returns for the company had been filed in an effort to avert a criminal fraud charge, wherein the costs expended on the residence were shown as "Advances."

Our first two findings of ultimate fact reflect our conclusions, after considering and weighing all the evidence in these matters of Benes' intentions with regard to ownership of the County Line residence and payment for the same. Where a stockholder receives money or property from his corporation, the courts hold that he derives taxable income as a result thereof. In some cases, for example as in *Simon* v. *Commissioner*, 248 F. 2d 869 (C.A. 8), reversing a Memorandum Opinion of this Court, the courts hold that the income is a taxable dividend to the extent of the corporation's earnings and profits available for distribution to its stockholders. In other cases, for example *Davis* v. *United States*, 226 F. 2d 331 (C.A. 6), and *Charles R. Leaf*, 33 T.C. 1093, affd. 295 F. 2d 503 (C.A. 6) (and see also in this connection *Weir* v. *Commissioner*, 283 F. 2d 675, 684–685 (C.A. 6), and *United States* v. *Goldberg*, 330 F. 2d 30 (C.A. 3), certiorari applied for), the courts, viewing the matter from the standpoint of what the stockholder has actually gotten, hold that the full amount derived by the stockholder is taxable income, irrespective of the earnings and profits position of the corporation. In the instant case, the respondent has determined that Benes derived "other income" (there being no reference to a "dividend") to the extent of the amounts expended by the company in building the County Line residence; and this amount so determined is, it will be noted, somewhat greater than the accumulated earnings and profits of the company. The respondent urges that the instant case is controlled by the rationale of the *Davis* case. The petitioners do not disagree that the *Davis* case approach is proper; but they argue that the facts of the present case are not such as to bring the instant case within it. The Court of Appeals for the Sixth Circuit, in its consideration of Benes' appeal from his conviction in the criminal case, has itself said: "The rationale of *Davis* v. *United States, supra,* is controlling here." *Benes* v. *United States*, 276 F. 2d 99, 105 (C.A. 6).

The *Davis* and *Leaf* cases involved factual situations where the stockholder had diverted (*Davis*) or withdrawn (*Leaf*) cash funds from the corporation which he controlled. Both cases rely strongly on *Rutkin* v. *United States*, 343 U.S. 130, where the taxpayer who had extorted money from a victim, sought to avoid a conviction for tax evasion on the ground that he had no right or title to the extorted funds, but was under an obligation to return them to the payor-victim. Consequently, the defendant argued that the extorted funds were not

taxable income to him. The Supreme Court, sustaining the conviction, held that the extorted funds were taxable income, saying in part:

An unlawful gain, as well as a lawful one, constitutes taxable income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it. * * * That occurs when cash, as here, is delivered by its owner to the taxpayer in a manner which allows the recipient freedom to dispose of it at will, even though it may have been obtained by fraud and his freedom to use it may have been assailable by someone with a better title to it.

In the instant case, the economic gain asserted to be flowing to petitioner Elmer Benes is not in the form of cash or checks. Rather, petitioner's benefit is a series of improvements made to real property which belonged to his wife—which improvements in toto are the County Line residence. These benefits were conferred upon him by the expenditure of funds by his corporation over a series of years; and the Commissioner's determination is that the total amount of such expenditures made by the company in each of the petitioner Elmer Benes' taxable calendar years here involved, is taxable income to said petitioner in each of the respective years. It seems to us that somewhat different criteria must be applied in determining (as we must in the instant case) whether a stockholder has derived economic benefit from the expenditures made in his behalf toward the erection of a residence, from those which are applied where he has received cash from the corporation directly (as was true in the *Davis* and *Leaf* cases). The respondent suggests that the criteria properly to be applied in the instant case are: (1) Whether the petitioner stockholder intended the County Line residence to be his residence from the very beginning; and (2) whether, while the residence was being constructed by his corporation, he had no intention to pay the corporation therefor, either as the residence construction passed through its varying stages toward completion, or upon ultimate completion. The petitioners appear to agree that these are the proper criteria. They seem reasonable to us; and we accordingly adopt them for use in the instant case. And, as will have been observed in our discussion of the factual matters hereinabove, we have found that these two criteria have been fully met in the instant case.

Accordingly, in line with our first two ultimate findings of fact, and in the light of the legal principles of the *Davis* and *Leaf* cases, we hold that petitioner Elmer Benes received taxable income, in the full amounts determined by the respondent to have been incurred and paid by the Benes Co. in each of the taxable years involved on the construction of the County Line residence property.

The amounts of "other income" determined by the respondent to have been received by petitioner Elmer Benes under this issue actually

include relatively small amounts for 1949 and 1950, which represent costs of certain repairs or improvements to the Hemlock Point Road property (Benes' residence until December 1949). See footnote 4, *supra*. These were charged to other construction jobs by the company just as the County Line residence costs were. Petitioners do not argue that any different principles apply to these than to the County Line residence costs. Nor do we perceive any reason for treating the two groups of expenditures differently. Accordingly, we also hold that the amounts expended by the company for repairs or improvements to the Hemlock Point Road property likewise constituted taxable income to Benes, $594.15 in 1949 and $458 in 1950.

## II

The second issue presents a question of constructive receipt of salary from the Benes Co. by the individual petitioners, Elmer and Frances Benes, for their calendar year 1947. That calendar year falls astride two of the company's fiscal years; i.e., its fiscal year ended May 31, 1947 (in which fall 5 months of calendar 1947), and May 31, 1948 (in which fall 7 months of calendar 1947). During the entire calendar year 1947, a resolution adopted by the company's directors in 1946 was in full force and effect, under which the company was obligated to pay Elmer Benes a salary as president of $12,000 per year (or $1,000 per month), plus a fiscal-year-end bonus of a percentage of the company's net profits, and under which also the company was obligated to pay Frances Benes a salary as secretary of the company of $600 per year (or $50) per month.

The company's returns for fiscal 1947 and 1948 show that it deducted compensation to Elmer Benes of $17,801.59 and $30,984, respectively; and that it deducted $600 in each year as compensation to Frances Benes.

On their joint return for the calendar year 1947, Elmer reported salary from the company of only $8,982.31 and Frances reported no salary at all. The respondent has determined that Elmer and Frances should have included, in their taxable income for 1947, additional salary from the company of $9,419.28, which is the difference between what the company deducted as salary for the two of them ($18,401.59) on its return for fiscal 1947, and the amount which Elmer Benes reported on the joint return for calendar 1947, which he and his wife filed.

Of course, if we had only evidence of what the company deducted in its fiscal 1947 return, and what the Beneses reported on their calendar 1947 return, we would have to say that the amount determined by respondent was excessive. For, insofar as the 5 months of the Beneses' 1947 calendar year which fell in the company's 1947 fiscal year are

concerned, the company was obligated to pay, and Elmer and Frances were only obligated to return the following amounts:

| | |
|---|---|
| 5 months' basic salary to Elmer Benes | $5,000.00 |
| 1947 fiscal-year-end bonus to Elmer Benes | 5,801.89 |
| 5 months' salary to Frances Benes | 250.00 |
| | 11,051.89 |

But we have additional evidence, from the company's fiscal 1948 return, that it was till deducting basic salary to Elmer of $1,000 per month for the period June through December 1947 (total $7,000) and $50 per month to Frances for the same 7 months (total $350). When we add these amounts to those for the first 5 calendar months of 1947, we see that the respondent's determination as to amounts is correct:

| | |
|---|---|
| Basic salary to Elmer (January–May 1947) | $5,000.00 |
| Year-end bonus | 5,801.59 |
| Basic salary to Frances (January–May 1947) | 250.00 |
| Basic salary to Elmer (June–December 1947) | 7,000.00 |
| Basic salary to Frances (June–December 1947) | 350.00 |
| Total 1947 compensation to Elmer and Frances deducted by the company on its returns for the fiscal years ended May 31, 1947 and 1948 | 18,401.59 |
| Less: Amount of salary from the company reported by Elmer and Frances on their 1947 joint return | 8,982.31 |
| Deficiencies (determined by respondent to have been constructively received) | 9,419.28 |

The legal principles applicable to constructive receipt of income are succinctly set forth in the following portion of respondent's regulations, section 1.451–2:

Constructive receipt of income. (a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account or set apart for him so that he may draw upon it at any time. * * *

See also, in this connection, *James J. Cooney*, 18 T.C. 883; and *Hurtz v. United States*, 162 Ct. Cl. 855.

Since Elmer, in his position as president of the company and with full power and authority, alone wrote the checks on the company's bank account, and since the company's cash position as far as this record shows was such as to permit the payment of the individual petitioners' full officer salaries as deducted by the company, we must conclude that Elmer and Frances could have actually withdrawn and received the full amount of their salaries. They must be regarded, as the respondent has determined, as having constructively received the full amounts.

We sustain the respondent's determination on this second issue.

### III

The third issue relates to the additions to tax imposed by the respondent in the individual petitioners' case under sections 294(d)(1)(A) and 294(d)(2).

Insofar as the additions under section 294(d)(1)(A) are concerned, the petitioners' counsel conceded at the trial that if the Court determined that Elmer should have included in income the amounts expended by the company in erecting the County Line residence, then petitioners would be liable for additions to tax under section 294(d)(1)(A). We have so determined; and in line with their concession, we here hold that they are liable for additions to tax under said section.

Regarding the additions under section 294(d)(2), respondent's counsel conceded at the trial that, in line with the Supreme Court's decision in *Commissioner* v. *Acker*, 361 U.S. 87, the petitioners were not liable for said additions. Upon the authority of the *Acker* case and in accordance with the respondent's concession, we hold that the individual petitioners are not liable for additions to tax under section 294(d)(2).

### IV

We come to the fourth issue: Whether the deficiencies in tax on the company's original returns and the deficiencies in the individual petitioners' returns—for all years involved for both the corporate and individual petitioners—were due, in any part, to fraud with intent to evade tax, within the meaning of section 293(b). If they were, then the respondent was correct in the imposition of additions to tax for fraud under said section.

The question presented is one of fact, to be resolved from a consideration of all the pertinent facts and circumstances here involved; and the burden is on the respondent to establish fraudulent intent by clear and convincing evidence. Sec. 1112, I.R.C. 1939; *Charles E. Mitchell*, 32 B.T.A. 1093, 1128, modified 89 F. 2d 873 (C.A. 2), affd. 303 U.S. 391.

We take up first the corporation's case.[6] Where fraud is alleged against a corporate taxpayer, the requisite proof of fraudulent intent is to be found in the acts of its officers, inasmuch as the corporation, being an artificial person created by law, can have no separate intent of its own apart from those who direct its affairs. See *Auerbach Shoe Co.*, 21 T.C. 191, 194, affd. 216 F. 2d 693 (C.A. 1); *Ace Tool & Eng.*,

---

[6] Attention is invited to fn. 1, *supra*, where we have explained that there were either no deficiencies or only very small ones determined against the Benes Co., due to the fact that it filed amended returns and paid additional taxes, prior to the issuance of respondent's notice of deficiency to the corporation herein.

*Inc.*, 22 T.C. 833, 843. In the instant case, Elmer Benes was the president, principal stockholder, a director, the chief (and only functioning) executive officer of the corporation.

The deficiencies on the company's original returns arose in overwhelming part from the practice of charging at Benes' direction the costs of the County Line residence (which, as we have held under the first issue, *supra*, was intended from the very beginning to be a personal residence for Benes and his family) to the construction costs of other jobs which the company was performing for its customers. The County Line residence costs so charged served to reduce, considerably and in each of the Company's taxable fiscal years here involved, the profits which it reported from the contracting business on its income tax returns. The practice of charging personal items to corporate business expense has been held to justify the imposition of additions to tax for fraud. *American Rolbal Corporation* v. *Commissioner*, 220 F. 2d 749 (C.A. 2), affirming per curiam on the basis of the Tax Court's findings of fact and opinion, T.C. Memo. 1954–67; *Lowy* v. *Commissioner*, 262 F. 2d 809 (C.A. 2), affirming a Memorandum Opinion of this Court.

Moreover, the manner in which these County Line residence costs were placed on the company's books of account was such as to conceal their true character as personal expenses of an officer-stockholder. The accountant McQuilkin, who prepared the company's returns, admitted at the trial, where he was called as a witness by the petitioners, that the company's practice amounted to concealment. The validity of McQuilkin's admission is fortified by reference to the fact that two revenue agents, both certified public accountants, Nisenson and Sullivan, examined the company's books and were unsuccessful in unearthing the fact that these personal costs had been charged off to company expense. And, it is to be borne in mind that when agent Sullivan conducted his examination, he had actually been made aware (through an informer's letter) of the existence of the County Line residence.

This brings us to yet another badge of fraud, Benes' untruthful statements, as a corporate officer, in response to inquiries from agent Sullivan, as to the cost of the County Line residence and the source of the funds used to pay for it. With full knowledge of the fact that said residence had actually cost in excess of $170,000, Benes told Sullivan that he was going to pay for it, partly with the proceeds from the sale of his former residence (the Hemlock Point Road property),[7] and partly with borrowed funds—and that none of the funds had their origin with the company.

---

[7] In point of fact, less than 2 months prior to the time when Benes made this statement to Sullivan, Benes had actually taken the proceeds received from the Hemlock Point Road property and invested them in a newly formed Alabama corporation.

The foregoing are but some of the indications of fraud in the company's case. There are others that can be gleaned from our findings of fact, but we will not prolong this opinion further by reciting them. Suffice it to say that after seeing and hearing the witnesses testify, and after considering and weighing the evidence herein, we are satisfied and we have found as an ultimate fact that the deficiencies in tax on the original returns filed by the company for each of the years involved are due to fraud with intent to evade tax. The fact that amended returns were filed by the company, attempting to correct the fraud that permeated the original returns, does not bar the imposition of the additions to tax for fraud. *Henry Naples*, 32 T.C. 1090; *Aaron Hirschman*, 12 T.C. 1223.

We sustain the respondent's imposition of the additions to tax for fraud against the company.

Turning to a consideration of the additions to tax for fraud in the case of the individual petitioners, Elmer and Frances Benes, we think that the deficiencies are likewise due, in overwhelming part, to fraud with intent to evade tax. These deficiencies are traceable, for the most part, to the failure to include as income on the individuals' returns the amounts expended by the company in building a personal residence for Benes and his family. We have held, under the first issue, that the amounts so expended were taxable income to Benes and should have been included on the joint returns which he filed with Frances.

In the circumstances of this case, the actions of Elmer Benes as the president of the Benes Co. are inextricably bound up with his actions as Elmer Benes, a private individual taxpayer. The fraudulent intent which actuated him in causing the corporation to understate its income, through charging and deducting his personal items as corporate expense, spills over to infect the joint returns which he and his wife filed. His omission to report the amounts expended for his benefit by his corporation was, we are convinced, done with a fraudulent intent to evade and defeat Federal income taxes which he knew to be due and owing. It makes no difference that he subsequently decided to pay the corporation for the County Line residence. It is his intent at the earlier times when he filed his returns that is material on this issue of fraud. As we have stated in our consideration of the first issue, Benes never intended to pay the corporation for the County Line residence until May 1951, after the corporate amended returns had been filed. Nor does Benes' acquittal by a jury of any fraud in his 1947 return constitute any bar to a finding of fraud for the same year in the instant case. Such acquittal in no way affects his civil liabilities in the instant case; and the present proceeding does not subject him to double jeopardy within the meaning of the Constitution. *Helvering* v. *Mit-*

*chell*, 303 U.S. 391; *Hoefle* v. *Commissioner*, 114 F. 2d 713 (C.A. 6) ; and *William G. Lias*, 24 T.C. 280, 321, affd. 235 F. 2d 879 (C.A. 4).

We have hereinbefore found as an ultimate fact, based upon a consideration and weighing of all the evidence, and we here hold, that the deficiency in the individual petitioners' income taxes for each of the years 1947 through 1950 is due to fraud with intent to evade tax. Accordingly, we also sustain the respondent's imposition of an addition to tax for fraud against the individuals under section 293(b) for each of said years.

## V

The fifth and final issue involves the question of the statute of limitations. Are assessment and collection of the deficiencies in tax and additions to tax against the Benes Co. for its fiscal year ended May 31, 1947, and against the individual petitioners, Elmer and Frances Benes, for the calendar year 1947, barred by the statute of limitations, section 275(a) of the 1939 Code?

Section 276(a) of said Code provides that in the case of a false or fraudulent return with intent to evade tax, the tax may be assessed at any time. For the same reasons which impelled us to conclude that the deficiencies of the company and of the individual petitioners for their fiscal and calendar year 1947, respectively, are due to fraud with intent to evade tax, we are impelled to conclude that the 1947 returns of said company and said individuals are likewise fraudulent with intent to evade tax. Accordingly, the bar of the statute of limitations is lifted.

Also, in the case of the individual petitioners, they omitted an amount of income from their 1947 return which was in excess of 25 percent of the gross income reported on such return. In this circumstance, section 275(c) provides a 5-year period within which the tax may be assessed. Here, the notice of deficiency was mailed to the individual petitioners on June 12, 1952, a date well within the 5-year period from the due date for the filing of their 1947 return; i.e., March 15, 1948. It follows that for this reason also, the assessment and collection of the individual petitioners' 1947 deficiency and additions to tax are not barred by the statute of limitations.

*Decisions will be entered under Rule 50.*