Henry Naples and Julia A. Naples, Petitioners, *v.* Commissioner of Internal Revenue, Respondent.

Henry Naples, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Julia A. Naples, Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Docket Nos. 60140, 60141, 60142. Filed August 19, 1959.

*Hugh J. Ritchie, Esq.*, for the petitioners.
*Eugene F. Reardon, Esq.*, for the respondent.

PIERCE, *Judge:* The respondent determined deficiencies in income tax and additions to tax against petitioners, as follows:

| Docket No. | Petitioner | Year | Defi-ciency | Additions to tax | | |
|---|---|---|---|---|---|---|
| | | | | Sec. 293(b) | Sec. 294 (d)(1)(A) | Sec. 294(d)(2) |
| 60140 | Henry Naples and Julia A. Naples | 1948 | $335.08 | $167.54 | | |
| | | 1949 | 1,314.22 | 657.11 | | |
| | | 1950 | 1,051.70 | 3,471.02 | $715.30 | $429.19 |
| 60141 | Henry Naples | 1951 | 3,401.70 | | 456.16 | 273.70 |
| 60142 | Julia A. Naples | 1951 | 3,275.70 | | 427.38 | 256.42 |

The issues presented for decision are:

(1) Was any part of the deficiency for each of the taxable years 1948, 1949, and 1950 due to fraud with intent to evade tax, within the meaning of section 293(b) of the Internal Revenue Code of 1939?

(2) Was the failure of the petitioners to file declarations of estimated tax for the year 1951 "due to reasonable cause," within the meaning of section 294(d)(1)(A) of the 1939 Code?

The only other issue raised by the pleadings, which pertained to deductions for legal fees, was abandoned by petitioners at the trial.

### FINDINGS OF FACT.

Petitioners, Henry Naples and Julia A. Naples, are husband and wife, whose principal residence is at Newport Beach, California. For each of the taxable calendar years 1948 and 1950, they filed a joint income tax return with the collector of internal revenue for the sixth district of California. For the taxable year 1949, petitioner Henry Naples filed an individual income tax return with the same collector. And for the taxable year 1951, each petitioner filed an individual return with said collector.

### Facts re Fraud.

Henry Naples graduated from high school in 1938 and thereafter entered the United States Navy. While serving in the Navy, he received an appointment to the United States Naval Academy, whereupon he entered a preparatory school in preparation for attendance at the Academy. He never attended the Naval Academy. At some time, he took evening courses at the California Institute of Tech-

nology and at the University of Southern California, none of which were in the fields of business administration or accounting.

In 1943 Henry entered the employment of the B. F. Goodrich Company, in its tire-fabricating plant located in Los Angeles. His original position was that of a draftsman; and he remained in that classification until sometime in 1951, when he was promoted to junior engineer. He was discharged by the Goodrich Company in June 1951, under circumstances hereinafter more fully described.

Henry's duties with the Goodrich Company were to make designs, drawings, and estimates for engineering maintenance work at the Goodrich plant. This maintenance work was performed by various independent contractors. He also made progress reports to his superiors on such maintenance jobs; and he certified to the satisfactory completion of a job before the contractor was paid.

Sometime in the summer of 1947, Henry conceived and put into effect a scheme for having the contractors make "kickback" payments to him, out of the moneys which they received from the Goodrich Company for their services. Under this scheme, Henry would notify a contractor that certain maintenance work was required at the Goodrich plant, and ask the contractor to look over the premises where such work was to be done. The contractor, after making such inspection, would telephone Henry and present a verbal cost estimate. Henry would then tell the contractor to add a certain amount to the estimate, which was to represent the amount of the kickback to him. Within the next few days, the Goodrich Company would send the contractor a form entitled "Inquiry for Price," which the latter would complete by giving as his price, a total figure comprising the original verbal estimate plus the amount of the kickback to be paid to Henry. The amount of the kickback was not stated separately. The completed inquiry form was thereupon returned to the Goodrich Company by the contractor as his bid; and Henry would see that such bid was accepted. The Goodrich Company would then issue its purchase order for the work; the contractor would perform the work and submit his invoice (including thereon the kickback which, again, was not stated separately) ; and, following Henry's certification as to the satisfactory completion of such work, the Goodrich Company would issue its check to the contractor in payment. The contractor, after receiving payment, would pay Henry the kickback theretofore agreed upon.

The amount of the kickback on each particular maintenance job performed for the Goodrich Company is not shown by the record. However, on one such job performed in 1950, the contractor's verbal estimate to Henry was $230; its total estimate submitted to the Goodrich Company after conferring with Henry was about $482; and the amount of the kickback paid to Henry was $250.

The various kickbacks were paid to Henry by checks of the contractors. During the years 1948 and 1949, the contractors usually issued such checks either to "Cash" or to Henry personally; and the latter either cashed the same or deposited them in a bank account in his name. However, in 1950, Henry, in an effort to conceal his kickback arrangements, opened a bank account under the fictitious name of Gregg Engineering Service, in the Security First National Bank of Los Angeles. Thereafter in 1951, he closed this bank account and opened a new one in the fictitious name of Lance Engineering, at a Los Angeles branch of the Bank of America. Following the opening of these fictitious-name bank accounts, Henry arranged to have the checks for kickbacks issued in the name of either Gregg Engineering Service or Lance Engineering; and they were deposited by Henry in one of the two bank accounts carried under these fictitious names.

Neither Gregg Engineering Service nor Lance Engineering was a bona fide business enterprise. Neither had any employees, any office or telephone, or any records or books of account; and neither was registered as a bona fide business name under the provisions of the Civil Code of the State of California. Henry did keep a memorandum of the checks for kickback payments, which were made payable to the order of said fictitious names. In addition, he had invoice forms printed, bearing the names of Gregg Engineering Service and Lance Engineering; and he supplied quantities of the same to the contractors who were making kickback payments to him. Also, he procured rubber stamps bearing these fictitious names, with which he endorsed the kickback checks received in 1950 and 1951.

During the year 1950, Henry used at least $31,000 of the sums which he had received as kickback, for personal investments in securities.

Henry's operation of the kickback scheme extended over a 4-year period, from mid-1947 to June 1951. The officials of the Goodrich Company knew nothing of these kickbacks until the latter date, when the plant manager learned of them as the result of an inquiry made by the Bank of America regarding the bona fides of the account carried by Henry in the fictitious name of Lance Engineering. Henry was then immediately discharged by the Goodrich Company.

In September 1951, the Goodrich Company brought suit in a State court against Henry, his wife, and the contractors who had made the kickback payments; and it thereby sought recovery of the amounts of such payments. This suit was subsequently transferred to the United States District Court for the Southern District of California; and following a 2-week nonjury trial on the merits, judgment was entered in favor of the Goodrich Company, and jointly against Henry, his wife, and the defendant contractors, in the amount of $52,728.70,

with interest. Shortly thereafter in 1954, Henry and his wife paid the Goodrich Company $14,500, and secured a general release from all liabilities to said company, including those under the judgment.

During the taxable years 1948, 1949, and 1950 which are here involved, Henry received kickbacks from at least eight different contractors who performed work for the Goodrich Company. These kickbacks aggregated not less than $1,535.82 for 1948; $6,941.03 for 1949; and $26,396.51 for 1950.

Among the contractors which made the kickback payments to Henry during said years were Troy Sheet Metal Works and Cox & Ward Machine Shop. The following tables show the dates and amounts of the checks by which such kickback payments were made:

TROY SHEET METAL WORKS

| Checks issued in 1948 | | Checks issued in 1949 | |
|---|---|---|---|
| Date of check | Amount | Date of check | Amount |
| Jan. 14 | $15.00 | Jan. 28 | $189.50 |
| Feb. 6 | 97.00 | Jan. 31 | 53.00 |
| Feb. 27 | 100.00 | Mar. 3 | 376.00 |
| Mar. 10 | 106.00 | Mar. 24 | 254.75 |
| Mar. 29 | 45.00 | Apr. 21 | 464.00 |
| Apr. 19 | 15.00 | Apr. 26 | 492.28 |
| May 10 | 16.00 | Apr. 26 | 500.00 |
| July 1 | 100.00 | May 5 | 650.00 |
| July 31 | 30.00 | May 17 | 250.00 |
| Aug. 18 | 378.52 | May 17 | 175.00 |
| Sept. 29 | 30.00 | May 17 | 325.00 |
| Nov. 15 | 185.50 | May 17 | 168.50 |
| Dec. 15 | 164.80 | June 28 | 693.50 |
| Dec. 17 | 253.00 | Aug. 18 | 476.50 |
| | | Sept. 9 | 299.50 |
| Total | 1,535.82 | Dec. 22 | 260.00 |
| | | Dec. 29 | 150.00 |
| | | Total | 5,777.53 |

COX & WARD MACHINE SHOP

| Checks issued in 1950 | | Checks issued in 1950 | |
|---|---|---|---|
| Date of check | Amount | Date of check | Amount |
| Mar. 4 | $280 | Sept. 30 | $423 |
| Apr. 17 | 200 | Oct. 13 | 633 |
| June 7 | 200 | Nov. 16 | 516 |
| June 15 | 196 | Dec. 18 | 613 |
| July 5 | 200 | Total | 3,391 |
| July 27 | 130 | | |

Both of the above-mentioned contractors, as well as the other contractors who made kickback payments to Henry, entered such payments on their books of account as commissions, engineering fees, and fees for consultant services; and all of these contractors took deductions for the same on their income tax returns.

On the various original income tax returns filed by Henry and his wife for the years 1948 through 1950, no part of the above-mentioned kickbacks was either disclosed or included in income. In connection

with the preparation of petitioners' joint return for 1950, Henry had sought the assistance of a certified public accountant, named Lloyd; and the latter had asked Henry about the source of the money with which he had bought certain stocks that had yielded dividends. Henry then told Lloyd that these stocks had been purchased with money which his wife had inherited, and with gain from the sale of his residence in 1947; but he did not reveal that at least $31,000 of the purchase price had been derived from kickback payments. Henry did mention very briefly to Lloyd that he had received money from certain contractors, which he referred to as gratuities; but he did not reveal the amounts so received. Lloyd was left with the impression that such amounts were small, and that they represented gifts for favors done by Henry to the contractors, "like a purchasing agent receives." Lloyd, therefore, did not include any such amounts in the income shown on the original 1950 joint return.

In September or October 1951, after the Goodrich Company had begun the above-mentioned suit, Henry went to a revenue agent, and there disclosed his receipt of the kickbacks. This revenue agent recommended that an amended 1950 income tax return be filed, on which the kickbacks should be included in income. Henry then again consulted Lloyd, who was "quite surprised" to learn of the magnitude of the kickbacks. Thereafter Lloyd prepared an amended 1950 joint return for Henry and his wife; included therein $23,782.52 of the kickbacks as taxable income; and filed such amended return in November 1951.

At least part of the deficiency in income tax for each of the taxable years 1948, 1949, and 1950 was due to fraud with intent to evade tax.

### Facts re Failure to File Declaration of Estimated Tax.

Neither of the petitioners filed a declaration of estimated tax for the taxable year 1951. For the preceding year 1950, they reported on their joint income tax return dividends of $1,624.38, and interest of $507.49; and it was reasonable to expect that they would have at least these amounts of income for the following year. In their separate returns for 1951, each did report dividends of $1,137.61, and interest of $220.31.

Henry did not personally know that he was required to file a declaration of estimated tax for the year 1951; and he relied upon the above-mentioned accountant Lloyd to prepare whatever Federal income tax returns or other instruments were required for that year. Lloyd did not advise either of the petitioners that it was unnecessary to file a declaration of estimated tax for said year; Henry did not consult him as to this matter, and the filing of declarations of esti-

mated tax was neither discussed nor mentioned in the conversations between Lloyd and Henry.

The failure of the petitioners to file declarations of estimated tax for the year 1951, was not "due to reasonable cause" within the meaning of section 294 (d) (1) (A).

OPINION.

1. The first issue for consideration is whether any part of the deficiencies for the years 1948, 1949, and 1950, was due to fraud with intent to evade tax, within the meaning of section 293 (b) of the 1939 Code. The question is primarily one of fact, to be resolved from consideration of all the material facts and surrounding circumstances disclosed by the record. The burden of proving fraud by clear and convincing evidence was on the respondent. Sec. 1112.

We have hereinabove, in our Findings of Fact, set forth all the material facts and surrounding circumstances as to this issue, which are disclosed by the present record. And we are convinced that the deficiencies for the years 1948, 1949, and 1950 were, in large part, due to fraud with intent to evade tax.

Henry, in the original income tax return filed for each of said years, did not disclose or include in income, any of the kickbacks which he received from contractors in connection with the work which they performed for the Goodrich Company. His failure to return for taxation the substantial amounts of these kickbacks was another phase of the overall pattern of fraud which he had perpetrated upon the Goodrich Company for a period of nearly 4 years. He is the one who had originated the scheme for such fraud, which embraced: Conniving with the contractors to prepare and submit excessive estimates to the Goodrich Company, which included the amounts of the prearranged kickbacks that he was to receive; using his position with the Goodrich Company to see that such excessive estimates were accepted, and that the amounts thereof were paid; collecting the prearranged kickbacks from the contractors, and depositing the same in his personal bank accounts, some of which were carried in names of fictitious enterprises; printing invoice forms bearing the names of said fictitious enterprises, which he supplied to the contractors in blank; and also procuring rubber stamps with which to endorse said fictitious names on the contractors' checks. Henry testified that he regarded the kickbacks as a "supplement in an indirect way [to] the salary which I was getting at Goodrich"; and it is clear, therefore, that he did know that the amounts were compensatory in character, and hence taxable.

Henry, in an effort to mitigate the effect of his having used the

fictitious-name bank accounts and forms, testified that one of his supervisors at the Goodrich Company had suggested that these be used, so that other employees of the company would not think that his enlarged income was due to favoritism of his supervisor. But such testimony provides no excuse (even if it could be accepted as credible); for the scheme was clearly fraudulent, and participation by two people rather than one, would not absolve either of them. Moreover, the supervisor was not called as a witness; there is no evidence, except Henry's testimony, which even tends to impute any wrongdoing to him; and there is evidence that, after the Goodrich Company discovered the fraud, it discharged Henry but continued to employ the supervisor. We think that Henry's testimony in this regard is not credible.

Also, in an effort to excuse the failure to report the kickbacks as income, Henry further testified that an accountant named Jackson had advised him in 1948 that the kickbacks might be regarded as gratuities, and had thereby inferred that they were nontaxable. But Jackson, like the supervisor, was not called as a witness; and we are unwilling to believe that any honest and competent accountant, after having been fully informed as to the true character of the amounts received from the contractors, would have advised Henry that the same did not constitute taxable income. Henry's second accountant, Lloyd, testified that his failure to include the kickbacks on the original 1950 return, was due to Henry's failure to disclose the amounts and true character of these items; and it is reasonable to assume that the same situation existed with respect to Jackson. We reject Henry's testimony with regard to Jackson, as being unworthy of belief.

Finally, it should be observed that the filing of the amended 1950 return, after the Goodrich Company had discovered the fraud and started its suit, in no way mitigates the fraud perpetrated in the filing of the original return. *Aaron Hirschman*, 12 T.C. 1223.

After having seen and heard all the witnesses, and after having considered and weighed all the evidence as to this issue, we hold that the respondent has fully borne his burden of proving that at least part of the deficiency for each of the years 1948, 1949, and 1950, was due to fraud with intent to evade tax. The determinations of the respondent as to this issue are approved.

2. The second issue is whether the failure of the petitioners to file declarations of estimated tax for the year 1951, was "due to reasonable cause" within the meaning of section 294 (d) (1) (A) of the 1939 Code. The burden of proving such reasonable cause was on the petitioners.

The excuse presented by Henry was, that he had left to his accountant, Lloyd, the responsibility of preparing whatever returns and

other instruments were necessary; and that he personally was not acquainted with the requirement for filing a declaration. But such excuse is inadequate. Unfamiliarity with the law does not excuse him; and he does not claim that, in his consultations with his accountant, Lloyd, such matter was even discussed. Lloyd testified that he gave no advice to the effect that the filing of a declaration of estimated tax was unnecessary; and he further testified that neither he nor Henry mentioned this matter.

It is well settled that "reasonable cause" within the meaning of the applicable statute, is not established by the mere showing that a taxpayer relied generally upon an accountant, without either discussing or obtaining the accountant's advice as to the necessity for filing a declaration of estimated tax. *John T. Potter*, 27 T.C. 200; *Coates* v. *Commissioner*, 234 F. 2d 459 (C.A. 8), affirming a Memorandum Opinion of this Court. See also *Ferrando* v. *United States*, 245 F. 2d 582 (C.A. 9).

Henry's wife was not a witness; and she presumably relied on the same insufficient excuse presented by her husband.

We decide this issue in favor of the respondent.

*Decisions will be entered for the respondent.*