Carl Sauer and Alice Sauer a.k.a. Carl Saunders and Alice Saunders v. Commissioner.
Sauer v. Commissioner
Docket No. 3120-63.
United States Tax Court
T.C. Memo 1965-236; 1965 Tax Ct. Memo LEXIS 95; 24 T.C.M. (CCH) 1197; T.C.M. (RIA) 65236; August 30, 1965
*95 Held, petitioners failed to prove that $35,000 deposited in their bank account purportedly as the purchase price of stock in a corporation owned 50 percent by petitioners was not taxable income as determined by respondent. Held, further: Respondent failed to prove that any part of petitioners' underpayment of tax for 1956 was due to fraud. Addition to tax for fraud disallowed. Joseph M. Carrabotta, for the petitioners. Nelson E. Shafer, for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined a deficiency in petitioners' income tax for 1956 and an addition thereto under section 6653(b), I.R.C. 1954, [1] in the respective amounts of $21,105.28 and $10,552.64. The issues for decision are: (1) Whether Carl Sauer, also known as Carl Saunders, who will hereafter be referred to as petitioner, realized unreported income in 1956 in the amount of $35,000 by virtue of a deposit in his bank account of a check for $35,000 drawn by his uncle, Valentine Christmann, purportedly for the purchase of 350 shares of stock of Sauer Chevrolet Sales, Inc.; and (2) *96 Whether any portion of any deficiency in income tax for the taxable year 1956 is due to fraud, with the result that petitioners are liable for the addition to tax provided by section 6653(b). Findings of Fact Petitioners are husband and wife who resided in Delavan, Wis., during 1956. They filed a joint Federal income tax return for the taxable year 1956 with the district director of internal revenue, Milwaukee, Wis. Petitioner's parents died when he was young and he was reared by his mother's brother, Valentine H. Christmann (hereafter referred to as Christmann), who provided his support and education when he was young. His first job was as a salesman with an automobile dealership, and he ultimately advanced to the position of sales manager. During the year 1956 petitioner was employed as president and general manager of Sauer Chevrolet, Inc. (hereafter referred to as Sauer, Inc.), an automobile sales agency in Delavan, at a salary of $12,000. Sauer, Inc., was incorporated under the laws of Wisconsin in 1954. In 1956, petitioner owned 50 percent of the issued and outstanding stock of the corporation; the remaining 50 percent was owned by Herman R. Salen (hereafter referred to as Salen), *97 who acted as secretary-treasurer and who had possession of the corporate books and records. Petitioner acquired his stock by purchase. Petitioner received and reported the amount of $24,00 as commissions from Sauer, Inc., during 1956 in addition to his salary. Also during 1956 petitioner was employed by Fencl-Pierce Chevrolet Co. in Chicago at a salary of $9,000, and he was a partner with Christmann in a partnership, Valentine Motor Sales, located in Waukesha, Wis.
Petitioner and Christmann were not only closely related and connected by business ties, but Christmann, who owned a farm and other property, had confidence in petitioner and relied upon his judgment.petitioner frequently borrowed money from Christmann during the periods he was engaged in the automobile business and Christmann even loaned petitioner money for medical expenses shortly before the trial. In 1956 petitioner made some payments to Christmann on these loans. In 1956 petitioner maintained a loan account at the Michigan Avenue National Bank of Chicago (hereafter referred to as the Michigan Avenue bank) where he had maintained an account since 1950. At the beginning of 1956, petitioner was indebted to the Michigan *98 Avenue bank in the amount of $36,061.67 on a note due on January 16, 1956. A summary of this loan account for the period under review is as follows: Number
Total
Date
of note
Due Date
Debit
Credit
liability
7/18/55
25,310
1/16/56
$36,061.67
$36,061.67
1/19/56
25,310
$36,061.67
1/19/56
27,648
7/16/56
23,697.67 [1]
23,697.67
5/24/56
29,346
6/22/56
10,050.00
33,747.67
6/22/56
29,346
10,050.00
23,697.67
6/29/56
29,867
Demand
7,500.00
31,197.67
7/16/56
27,648
8,697.67
22,500.00
7/20/56
27,648
15,000.00
n2
7/20/56
30,155
1/14/57
15,000.00
22,500.00
8/17/56
29,867
7,500.00
15,000.00
10/12/56
31,262
11/10/56
20,103.33
35,103.33
11/23/56
31,262
4,000.00
31,103.33
11/26/56
31,262
16,103.33
15,000.00
12/27/56
32,195
1/28/57
8,039.11
23,039.11
1/22/57
30,155
15,000.00
8,039.11
1/28/57
32,195
8,039.11
1/28/57
32,686
2/27/57
8,040.00
8,040.00
1/29/57
32,714
7/24/57
36,050.00 [3]
44,090.00
On January 16, 1956, petitioner, as maker, executed a promissory note payable to Christmann in the principal amount of $23,000 with interest at 6 percent per annum, due July 16, 1956; on July 16, 1956, petitioner, as maker, executed a note *99 payable to Christmann in the principal amount of $15,000 with interest at 6 percent per annum, due January 14, 1957; and on January 25, 1957, petitioner, as maker, executed a note payable to Christmann in the principal amount of $35,000 with interest at 6 percent per annum, due July 24, 1957. Each of these three notes was a printed form of the Michigan Avenue bank where principal of the notes was to be paid, and each note was endorsed on its reverse side by Christmann who guaranteed payment of principal when due with interest at 7 percent per annum. The note dated January 16, 1956, corresponds to note No. 27,648 as recorded on the records of the Michigan Avenue bank as shown above; the note dated July 16, 1956, corresponds to note No. 30,155 as recorded on the bank records; and the note dated January 25, 1957, corresponds to note No. 32,714 as recorded on the bank records. The Michigan Avenue bank was holder of these notes, probably by virtue of discount from Christmann. The above loan records of petitioner maintained by the Michigan Avenue bank indicate that each note payable to the bank, of which petitioner was maker, was secured. Note No. 27,648, dated January 16, 1956, recited *100 on its face that payment was secured by the following collateral: (1) 350 shares of stock of Sauer, Inc., having a book value of $42,000; (2) Term life insurance on life of petitioner in face amount of $35,000; (3) Assignment of funds to be received from sale of the partnership, Valentine Motor Sales; [2]
(4) The used autos and accounts receivable of Valentine Motor Sales. Note No 30,155, dated July 16, 1956, recited on its face that payment was secured by collateral consisting of 350 shares of stock of Sauer, Inc., and by a term life insurance policy on the life of petitioner in the amount of $35,000. Note No. 32,714, dated January 25, 1957, recited on its face that payment was secured by collateral consisting of 350 shares of stock of Sauer, Inc.; 500 shares of stock by Ray Fencl Ford, Inc., having a market value of $53,500; and by a life insurance policy on the life of petitioner in the amount of $35,000. On April 5, 1957, petitioner deposited with the Michigan Avenue bank, as collateral to secure payment of his notes of which the Michigan Avenue bank was holder, the following items: (1) Certificate *101 No. 4, representing 250 shares of stock of Sauer, Inc., dated August 1, 1955; (2) Certificate No. 5, representing 100 shares of stock of Sauer, Inc., and dated August 1, 1955; (3) Certificate Nos. 4, 5, and 6, representing a total of 500 shares of stock of Ray Fencl Ford, Inc.; (4) A life insurance policy insuring petitioner in the amount of $35,000. The records of the Michigan Avenue bank do not indicate that it received any collateral to secure petitioner's obligations prior to April 5, 1957, although the three notes executed by petitioner in 1956 and in January 1957 and payable to Christmann and ultimately held by the Michigan Avenue bank indicated that petitioner had deposited collateral to secure their payment. However, it was a practice of the Michigan Avenue bank to accept the promise of a borrower to deliver agreed collateral at a later date (which promise was termed a trust receipt by bank employees) in lieu of depositing collateral when borrowed funds were obtained. In such event, collateral referred to in the trust receipt was merely copied and itemized on the printed note form in the space for listing of collateral to secure the note. Stock certificates Nos. 4 and 5 representing *102 stock of Sauer, Inc., which were deposited as collateral with the Michigan Avenue bank on April 5, 1957, were not issued by the corporation but were prepared solely by petitioner who forged the name of Salen. Attached to each certificate deposited as collateral was a power to transfer the stock, executed by petitioner. In early 1956, petitioner told Christmann that he had an opportunity to buy an additional 25 percent of the stock of Sauer, Inc. Petitioner told Christmann that this additional 25-percent stock interest had a book value of $41,000-$47,000 but that it could be purchased for $35,000. Christmann said that he - Christmann - would buy the stock if petitioner was going to remain in the business. On March 6, 1956, Christmann, as drawer, prepared a check drawn on his account at the Michigan Avenue bank and payable to the order of petitioner. The check was in the amount of $35,000 and was certified by the Michigan Avenue bank. Christmann took the check to the Upper Avenue National Bank of Chicago, Illinois, where petitioner maintained a checking account, and Christmann wrote on the back of the check the following: For purchase of, 25% Sauer Chev. For deposit, only to Upper, *103 Ave National Bank, for account of, Carl Sauer. As a result of the foregoing endorsement, petitioner's account at the Upper Avenue National Bank was credited with the amount of $35,000. Christmann's check cleared his account at the drawee bank. Christmann received from petitioner a printed stock certificate, No. 209, purporting to represent 350 of the 3,000 authorized [3] shares of stock of Sauer, Inc. This certificate was issued in the name of petitioner as owner on February 19, 1956. It was signed by petitioner as president and purportedly signed by Salen as secretary-treasurer. It was endorsed in blank by petitioner. Salen's signature was written by petitioner without Salen's knowledge or authority. Christmann considered that he owned 350 shares of stock of Sauer, Inc., acquired by purchase from petitioner for $35,000. However, he made no attempt to find out the financial situation of the corporation *104 or to make certain that the stock was registered on the corporate books in his name because he understood that petitioner did not want Salen to know that he was a stockholder. Christmann made no attempt to determine (and at the date of trial he did not know) whether he had purchased the stock from petitioner, from Salen (through petitioner), or as unissued stock from Sauer, Inc. He purchased an automobile from Sauer, Inc.; this was his only contact with the corporation. Christmann maintained a loan account at the Michigan Avenue bank and from time to time deposited various securities with the bank to be used as collateral for this loan account. On March 12, 1956, Christmann deposited with this bank as collateral stock certificate No. 209 of Sauer, Inc., which he had received from petitioner. Christmann's collateral record at the bank indicates that the certificate was pledged by virtue of an hypothecation agreement signed by petitioner because the certificate was issued in the name of petitioner. The Michigan Avenue bank would have returned the certificate to petitioner, rather than to Christmann, if Christmann's loan and collateral account had been closed out. [4] *105 At some date after January 1, 1957, Christmann had occasion to submit a net worth statement to a potential creditor, and, reflected as an asset on this net worth statement, was an item termed an "Interest in Sauer Chevrolet, Delavan, Wisconsin-$49,000." In 1956 or in 1957, petitioner sold his 50-percent stock interest in Sauer, Inc., to Salen by endorsing and delivering to Salen certificates representing 50 percent of the issued and outstanding stock of the corporation. These certificates had been issued by the corporation and represented petitioner's entire interest in the stock of Sauer, Inc. Petitioners did not report the $35,000 received from Christmann as income on their 1956 income tax return, nor was the transaction mentioned on the return. Respondent determined that petitioners realized additional income in the amount of $35,000 in 1956 by reason of Christmann's deposit of this amount to petitioner's bank account. Respondent also determined *106 that petitioners are liable for the addition to tax for fraud, alleging in his answer that petitioners' failure to report the $35,000 received from Christmann as income was due to fraud with intent to evade tax. Opinion Petitioner received $35,000 from his uncle, Christmann, in March 1956. Petitioner claims it was a loan, and nontaxable. Christmann testified that the $35,000 was deposited in petitioner's bank account as payment for a 25-percent stock interest in Sauer Chevrolet, Inc., and he so indicated on his check which he deposited in petitioner's bank account. Respondent claims that the $35,000 was income from a swindle and taxable as ordinary income to petitioner. The oral evidence offered by the parties is conflicting and the written records pertaining to this transaction offered in evidence are incomplete and inconclusive. The stock transfer book of Sauer, Inc., was not offered in evidence, and quite probably would have been of no help anyway, inasmuch as petitioner admits that stock certificates Nos. 4 and 5 for 250 and 100 shares, respectively, and certificate No. 209 for 350 shares, were all forged by him and issued without authority. Records pertaining to petitioner's account *107 at the Upper Avenue National Bank, wherein Christmann's check for $35,000 was deposited, were not offered in evidence, although petitioner admitted that his account was credited with the $35,000. If the $35,000 was a loan, no note evidencing the indebtedness was offered in evidence and there is no evidence that any payments were made thereon. Perhaps this is not entitled to too much weight because the record indicates that dealings between petitioner and Christmann were quite informal and that Christmann may have loaned petitioner money at other times without taking notes as evidence thereof, although petitioner did give Christmann notes for three loans made to him by Christmann in January and July 1956 and in January 1957 (probably renewals of the earlier loan), which Christmann apparently discounted at the Michigan Avenue bank. The records of Christmann's loan account at the Michigan Avenue bank were not offered in evidence. Petitioner claims that certificate No. 209, dated February 19, 1956, which Christmann testified he received from petitioner shortly after he deposited the $35,000 in petitioner's bank account in March 1956, was never delivered to Christmann but was delivered *108 to the Michigan Avenue bank as collateral for loans the bank made to petitioner, usually on Christmann's guarantee. The certificate was received in evidence but the record is silent on who had possession of it prior to the trial. However, the Michigan Avenue bank records do indicate that certificate No. 209 was delivered to the bank on March 12, 1956, and credited to Christmann's collateral record under an hypothecation agreement from petitioner because the certificate was issued in petitioner's name, and that certificates Nos. 4 and 5 were used as collateral to secure loans made by the banks to petitioner. The bank records indicate that no stock of Sauer, Inc., was received by the bank as collateral for loans to petitioner prior to April 5, 1957. Furthermore, Christmann did include an interest in Sauer, Inc., in a net worth statement he submitted to the Michigan Avenue bank as of January 1, 1957. Based on the record as a whole and our observation of the witnesses as they testified we are inclined to the view that Christmann at least thought he was buying a 25-percent interest in Sauer, Inc., when he deposited the $35,000 check in petitioner's account and that he intended that amount *109 to be in payment for the stock. We also believe he received certificate No. 209 as indicative of the interest he throught he purchased. We can see little reason for him to testify other than to the fact. It does seem strange that he did not bother to check out his purchase on the company records. However, he had always treated petitioner as a son and trusted in his integrity, and apparently had no prior reason to doubt it. There appeared to be little, if any, animosity between Christmann and petitioner even at the trial. Petitioner may have considered that the $35,000 was a loan because he knew the certificate was a fake but we are convinced that he delivered the certificate to Christmann at about the time the $35,000 was deposited in petitioner's account. Respondent has determined that the $35,000 was taxable income to petitioner and his determination is presumptively correct, the burden being on petitioner to prove by a preponderance of the evidence that it is wrong. In our opinion petitioner has failed to carry this burden. His only argument is that the $35,000 was a loan, and thus not taxable income; he does not argue that if it was not a loan it was not taxable. But he has not *110 convinced us by competent evidence that the amount he received from Christmann was in fact a loan. The documentary evidence only serves to confuse the issue. While it appears from the records of petitioner's loan account that the proceeds of the three notes petitioner executed in January and July 1956 and in January 1957, which were made payable to Christmann, were debited to petitioner's loan account for some reason, there is no tie-in between these notes and the $35,000 Christmann deposited in petitioner's account at the Upper Avenue bank in March 1956. Having no record of Christmann's loan account at the Michigan Avenue bank we do not know whether he borrowed money at that time in order to pay petitioner the $35,000. But even if he did, this would not reflect what the payment was for. All we know from the documentary evidence is that at about the time Christmann issued his $35,000 check to petitioner, Christmann also deposited certificate No. 209 of Sauer, Inc., in his own collateral account at the Michigan Avenue bank, where it remained at least until 1964. If the $35,000 was not in fact a loan we find no grounds for omitting it from petitioner's taxable income and respondent's *111 determination must stand. There is no question that petitioner received the money in 1956 and had complete dominion and control of it. Taxable income is defined in section 63 of the 1954 Code as gross income minus certain deductions, and gross income is defined in section 61(a) as "all income from whatever source derived" including but not limited to certain items specified therein. Respondent argues that the $35,000 was income from a swindle and that, as such, it is taxable income, relying on Akers v. Scofield, 167 F. 2d 718, certiorari denied 335 U.S. 823; L. M. Muldrow, 38 T.C. 907; Henry C. Boucher, 18 T.C. 710; Rollinger v. United States, 208 F. 2d 109. But whether the evidence would support the conclusion that petitioner was guilty of obtaining funds from Christmann fraudulently and by false pretense so that he would be guilty of a crime under Ill. Ann. Stat., ch. 38, sec. 253, [5] *113 or that he committed embezzlement perhaps by converting funds which Christmann gave him to buy valid stock in Sauer, Inc., [6] we need not decide. Gains, legally or illegally obtained, are subject to tax, and the distinction for tax purposes between gains acquired through embezzlement, where title *112 does not pass, and through other illegal acts, where title is considered to pass, has been eliminated by James v. United States, 366 U.S. 213. Unless petitioner can prove that the $35,000 was obtained, legally or illegally, from a nontaxable source or in a nontaxable manner, it would constitute taxable income to him in 1956. Marvin E. Nerem, 41 T.C. 338. The Supreme Court in James v. United States, supra, held that when a taxpayer *114 receives that which would otherwise constitute taxable income, lawfully or unlawfully, the amount is subject to taxation, unless there is consensual recognition, express or implied, of an obligation to repay, if there is no restriction as to disposition of the amount, even though the taxpayer may be adjudged liable to restore the equivalent of the funds. Here, petitioners have not demonstrated that there was a "consensual recognition" on the part of petitioner and Christmann that petitioner repay the amount of $35,000. See L. M. Muldrow, supra.The testimony of Christmann, who has never taken steps to obtain restitution from petitioner, is not so definite and unequivocal that we would have to conclude that petitioner obtained the funds illegally. And we do not hold that petitioners, to sustain their burden of proof, must prove that petitioner did not commit a crime. We hold simply that the evidence shows clearly that petitioner received the amount of $35,000 in the taxable year in question and that they have failed to sustain their burden proving the contrary of respondent's determination that the amount constitutes ordinary income to them in 1956 - which determination we are unable *115 to conclude is arbitrary. On this issue, respondent must prevail. The second and final issue relates to the asserted liability of petitioners for the addition to tax for fraud for the taxable year 1956.[7] Respondent alleges and contends that petitioners are liable for the addition to tax because of petitioners' fraudulent failure to report on their return for 1956 the amount of $35,000 which petitioner received from Christmann. While the burden of proof with respect to the first issue was on petitioners, the burden of proof with respect to fraud is on respondent. Sec. 7454(a), I.R.C. 1954; Snell Isle, Inc. v. Commissioner, 90 F. 2d 481, affirming a Memorandum Opinion of this Court, certiorari denied 302 U.S. 734. And the proof of fraud must be by evidence which is clear and convincing. Sidney Cohen, 27 T.C. 221. Respondent is not relieved of this burden despite the fact that we have sustained his determination with respect to the deficiency in tax. Sidney Cohen, supra; L. Schepp Co., 25 B.T.A. 419; see Thomas B. Jones, 29 T.C. 601. The record does not permit us to hold that respondent has proved convincingly that petitioners' *116 return for the year 1956 was false and fraudulent by reason of the omission of the amount of $35,000. Respondent argues that the failure to report the proceeds of a fraudulent scheme may be the basis for the addition to tax for fraud. The proposition is correct. See Henry Naples, 32 T.C. 1090; Henry C. Boucher, supra.But it does not necessarily have any bearing on the facts established in this case. In the Naples and Boucher cases, the taxpayers over a period of years consistently omitted amounts which clearly represented income to them - kickbacks in the nature of compensation in the Naples case; overcharges on sales in the Boucher case. In both cases it appears that the taxpayers had some awareness that the amounts which they were receiving constituted taxable income. In contrast, in the present case we have no evidence that petitioner ever attempted to or did obtain money from his uncle or anyone else under false pretenses, except possibly on this one occasion. Nor have we any evidence, directly or by implication, that petitioner realized or thought that he was receiving taxable income from Christmann on this occasion. It is undisputed that Christmann loaned petitioner money *117 prior to and during the period in question, and even subsequent to his discovery that the stock he thought he bought was invalid. While we have found that petitioner delivered an invalid certificate of stock to Christmann at about the time Christmann deposited the $35,000 check in petitioner's account, it is possible that petitioner in good faith believed that the certificate was to be used only as collateral for Christmann to secure a loan from the bank or to discount petitioner's own notes to Christmann at the bank, and that the $35,000 was thus in the nature of a nontaxable loan. Or even if we accept the proposition that petitioner deliberately sold Christmann an invalid certificate of stock, there is no evidence that he realized it produced taxable income. Petitioner made no effort to conceal his receipt of the money; he made no effor to hide it from the taxing authorities; it was deposited in a bank account in his own name. As with the first issue, we must decide this second issue on the failure to carry the requisite burden of proof. Respondent has failed to prove by clear and convincing evidence that petitioner's omission of the $35,000 from his income reported on his 1956 *118 income tax return or that any part of the underpayment of tax for the year 1956 was due to fraud. We hold for petitioners on this issue. Decision will be entered for the respondent on the deficiency in tax. Decision will be entered for the petitioners on the addition to tax for fraud. Footnotes
1. Statutory references herein are to the Internal Revenue Code of 1954 unless otherwise noted.↩
1. Principal amount of note No. 27,648 was indicated to be $23,000. The partnership Valentine Motor Sales was probably being liquidated at this time.
[2] No amount shown on bank record. According to the printed stock certificates in evidence, the authorized capital of Sauer, Inc., was $300,000, consisting of shares of a par value of $100 each. The record does not indicate how many shares were issued and outstanding, and Christmann made no effort to discern this fact.
[3]↩ Principal amount of note No. 32,714 was indicated to be $35,000.
4. The record does not indicate when - or whether - the loan was ever discharged and the certificate returned to petitioner. It appears that as of January 16, 1964, the Michigan Avenue bank still held the certificate under petitioner's hypothecation agreement.
5. Sec. 253. Obtaining signature or goods - Indictment not quashed on ground of another felony - Passing of title unnecessary - Penalty. Whoever, with intent to cheat or defraud another, designedly by color of any false token or writing, or by any false pretense, obtains the signature of any person to any written instrument, or obtains from any person any money, personal property or other valuable thing, shall be fined in any sum not exceeding $2,000, and imprisoned not exceeding one year, and shall be sentenced to restore the property so fraudulently obtained, if it can be restored. No indictment for the obtaining of any property or thing by any false pretense or pretenses shall be quashed, nor shall any person indicted for such offense be acquitted, for the reason that the facts set forth in the indictment, or appearing in evidence, may amount to a larceny or other felony; nor shall it be deemed essential to a conviction, that the property in the goods or things so obtained shall pass with the possession to the person so obtaining it. (This provision was repealed. 1961, July 28, Laws 1961, p. 1983, sec. 35-1. Effective Jan. 1, 1962.] 6. In order that petitioner be guilty of violation of the Illinois false pretense statute set forth in footnote 5, he must have obtained the funds from Christmann with the intent to defraud. People v. Scowley, 353 Ill. 330, 187 N.E. 415, 418 (1933). Embezzlement involves secrecy and concealment of conversion of funds; People v. Parker, 355 Ill. 258, 189 N.E. 352, 363↩ (1934); and it would appear that petitioner could not have been guilty of the crime under any theory of Christmann's testimony which indicates that he could have instructed petitioner as his agent to purchase the stock from Salen or from Sauer, Inc., and to have it registered in petitioner's name. Christmann deposited the funds in petitioner's account himself and there is no evidence that petitioner expended the funds secretly or otherwise.
7. Petitioners did not plead the statute of limitations.↩