B. J. and OUIDA STEVENS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Stevens v. Commissioner
Docket No. 26970-82.
United States Tax Court
T.C. Memo 1985-506; 1985 Tax Ct. Memo LEXIS 122; 50 T.C.M. (CCH) 1180; T.C.M. (RIA) 85506; September 26, 1985. *122 Held: (1) The Commissioner's determination of deficiencies for 1977 and 1978 is sustained, as modified herein. (2) Part of the underpayment for each year was due to fraud on the part of Ps. Steven W. Strange, for the petitioners. William P. Hardeman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies *123 in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6653(b)
Year
Deficiency
I.R.C. 1954 [1]
1977
$30,622.80
$15,311.40
1978
25,845.40
12,922.70
The issues for decision are: (1) Whether the petitioners understated their taxable income in the amounts determined by the Commissioner; and (2) whether any part of the underpayment of tax for each year was due to fraud within the meaning of section 6653(b). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, B. J. and Ouida Stevens, husband and wife, maintained their legal residence in Fort Worth, Tex., at the time they filed their petition in this case. They filed their joint Federal income tax returns for 1977 and 1978 and their joint amended return for 1977 with the Internal Revenue Service Center, Austin, Tex. The petitioners used the cash method of accounting. Mr. Stevens will sometimes be referred to as the petitioner. The petitioner was employed as a sergeant with the Fort Worth Police Department *124 until his retirement sometime in 1977. In 1977 and 1978, he also acted as the supervisor of security for most, though not all, of the events held at the Tarrant County Convention Center (the convention center) in Fort Worth. He had coordinated security at the convention center since its opening in the 1960s, and he was still supervising security there at the time of trial. Mr. Stevens was not an employee of the convention center; rather, on most of the "Permit to Use" contracts executed by the convention center and the promoters of events held at the convention center, his name was listed as the person to contact to make security arrangements. Such contracts required that the promotor supply and pay police officers to provide security at the promoter's event. The convention center specified the number of police officers necessary for each event and required that the police officers be offduty or retired members of the Fort Worth Police Department. After being contacted by a promoter, the petitioner secured the police officers needed for the event. The number of police officers required varied depending on the nature of the event and the size of the crowd anticipated.For example, *125 the convention center typically required 40 officers for a rock, rhythm and blues, or pop concert, but only 10 to 20 officers for a country-western concert. During concert performances, employees of the convention center and of the promoters often walked through the convention center and counted the police officers present to insure that the required number were actually employed. On no known occasion did Mr. Stevens supply fewer than the required number of officers. In 1977 and 1978, the petitioner supervised security at trade shows, conventions, and concerts. At the commencement of an event, the petitioner conducted a roll call of the officers and assigned them their security duties. At the end of an event, the petitioner submitted to the promoter an invoice itemizing his own supervisor's fee and the officers' fees. Trade show and convention promoters generally paid the bill by check, but in almost every instance, concert promoters paid the petitioner in cash from funds collected at the box office. It was common practice for concert promoters to pay the representative of the ushers and ticket takers and the representative of the police in cash so that the representatives could *126 pay their crews immediately at the end of the event. If he received cash from the box office, Mr. Stevens retained his supervisor's fee and distributed the remainder to the police officers by placing each officer's share into an envelope bearing the officer's name and then giving the envelope to the officer. The petitioner often placed the currency in the envelopes while he was still in the box office and within sight of the box office staff, but the envelopes were distributed to the officers elsewhere in the convention center. On many occasions, Mr. Stevens' assistant supervisor, A. R. Russell, submitted the invoice to the promoter at the box office, collected the cash, and distributed it among the officers. If a promoter paid by check, Mr. Stevens deposited the check into a checking account entitled the B. J. Stevens Special" account (the special account). He then issued checks from the special account to the police officers who had worked at the event. The petitioner made payments by check totaling $26,827.50 in 1977 and $31,796.75 in 1978 to police officers who assisted in providing security at the convention center. During 1977 and 1978, police officers hired by Mr. Stevens *127 were paid a wage consistent with that which they made with the Fort Worth Police Department, $6 to $7 per hour. An examination of the available invoices submitted to promoters reveals that the promoters were usually charged a flat fee for each officer, which, if divided by the number of hours worked, indicates that the officers' services were billed at a rate of about $6 or $7 an hour until late 1978, when the rate went up to about $8 an hour. Two officers were usually assigned to the stage door, and they were generally paid at a rate of about $7 to $8 an hour until the last months of 1978, when the rate rose to about $9 an hour. In no known instance did Mr. Stevens charge the promoters more for the police officers than he actually paid the officers. Although he has since changed his recordkeeping practices, the petitioner in 1977 and 1978 retained no records listing the names of the officers who worked at each event or the amounts paid to them. During the course of the IRS examination of his tax returns, Mr. Stevens furnished the revenue agent with "currency worksheets" listing the concerts for which he furnished security in 1977 and 1978, the dates of such concerts, and the *128 amount of cash that he retained as his supervisor's fee from the gross security fee charged for each concert. The currency worksheets do not appear to have been prepared contemporaneously with the concerts. In 1977, the petitioner received $3,800 in cash in payment for investigatory services that he furnished to attorneys representing a criminal defendant. The petitioner did not furnish security at the Will Rogers Coliseum in 1977 or 1978. The petitioners' original tax return for 1977 and their tax return for 1978 were prepared by their certified public accountant. At the time of the preparation of the returns, Mr. Stevens did not tell his accountant about the currency which he received for providing security at concerts. On Schedule Cs attached to the original 1977 return and the 1978 return, the petitioners reported that Mr. Stevens received "gross receipts" from providing temporary security services of $11,066 in 1977 and $8,971 in 1978. Such amounts were calculated by examining the deposits and withdrawals from the special account and consisted of the alleged net amount that Mr. Stevens, after paying the police officers who assisted him, retained of the gross security fees *129 paid by check by promoters. Such amounts did not include the currency that Mr. Stevens received from concert promoters and from the defense attorneys. On the Schedule Cs, the petitioners claimed deductions for various expenses, including a home office, associated with Mr. Stevens' furnishing of temporary security services. On or about July 5, 1979, the petitioners filed an amended return for 1977. A few days earlier, it was reported in the Sunday Fort Worth Star-Telegram that Mr. Stevens had received $2,569.20 in cash for services that he had rendered, while still a member of the police department, to the attorneys representing the criminal defendant. The amended return reported additional income of $11,200 and was also prepared by the petitioners' accountant. Such additional income consisted of currency income (net of any amounts paid to assisting police officers) that Mr. Stevens told the accountant that he received in 1977 and 1978 from concerts at the convention center and from the defense attorneys. The accountant mistakenly included all such income on the amended return for 1977. The petitioners remitted the balance due, as shown on the amended return, with the return. *130 At the time the petitioners filed their original 1977 return and their 1978 return, Mr. Stevens knew that the currency which he had received from concert promoters as his supervisor's share and the currency which he had received from the attorneys was income and that he was required to report such income on his Federal income tax returns. In his notice of deficiency, the Commissioner datermined that Mr. Stevens had unreported gross receipts of $113,771.40 in 1977 and $91,676.78 in the 1978 from providing security services. [2] After allowing deductions for payments to police officers of $30,777.50 in 1977 and $35,180.17 in 1978, and after disallowing the petitioners' claimed deductions for an office in the home, the Commissioner determined that the petitioners had unreported taxable income of $84,857.90 in 1977 and $58,549.61 in 1978. The Commissioner also made adjustments to the petitioners' claimed itemized deductions for both years. The disallowance of the deduction for the home office expenses and adjustments of the itemized deductions have not been contested by the petitioners. The notice of deficiency did not take into account the income reported on, and the additional *131 tax paid with, the petitioners' amended 1977 tax return. The Commissioner computed the unreported gross receipts (i.e., the full amount paid by promoters without reduction for amounts paid to assisting police officers) through a method employing both a bank deposits analysis and a percentage estimate of gross currency receipts. Mr. Stevens' gross receipts from promoters that paid by check were calculated under a bank deposits method, which may be summarized as follows: 1977
1978
Total deposits to
all accounts [3]
$109,329.88 $53,555.79 Less: Non-income
deposits
(44,207.17)
(5,384.17)
Income deposited
$ 65,122.71 $48,171.62 Less: Deposits of
wages, retirement
pay, and interest
income
(12,267.05)
(7,538.84)
Gross receipts
deposited
$ 52,855.66 $40,632.78 *132 A more elaborate percentage method was used to compute the gross receipts that Mr. Stevens received in currency. The Commissioner's revenue agent first created a list of all concerts held at the convention center in 1977 and 1978 and wrote a letter to each concert's promoter for which he had an address asking the promoter to list the amounts paid to Mr. Stevens for security provided at the promoter's concerts at the convention center and the date of such payments. The information provided by the promoters that responded to the agent's request was then compared to the information on the currency worksheets furnished by Mr. Stevens. Some promoters reported that they had made payments to the petitioner for security at concerts that were not listed on the currency worksheets. Some promoters of events listed on the currency worksheets either did not respond to the agent's request or could not be contacted by him. The following tables summarize and compare the information furnished by the promoters and by the petitioner on his currency worksheets: 1977 CONCERTS
Gross
Supervisor's
Supervisor's
Security
Fee Per Currency
Fee Per
Fee Per
Date
Attraction
Worksheets
Confirmation
Confirmation
1/21
Ted Nugent
$125.00
$100.00
$1,340.00
2/18
Willie Nelson
125.00
100.00
1,824.00
5/15
Fleetwood Mac
125.00
1,533.00
5/20
Captain & Tennelle
75.00
401.00
6/21,
6/22
Aerosmith
250.00
3,303.83
7/3
Alice Cooper
125.00
1,554.00
7/7,
7/8
Eagles
250.00
250.00
4,017.00
7/29
O'Jays
125.00
1,810.00
7/30,
7/31
Ted Nugent
125.00
250.00
3,984.00
9/4,
9/5
Kiss
250.00
250.00
4,082.00
9/24
Charlie Pride
75.00
436.00
10/12
Chicago
125.00
125.00
1,558.00
10/21
Merle Haggard
75.00
75.00
544.00
10/29
Emerson, Lake &
Palmer
125.00
1,565.00
11/19
Grand Ole Opry
75.00
75.00
713.00
11/23
Crosby, Stills &
Nash
125.00
125.00
1,558.00
11/27
Rod Stewart
125.00
125.00
1,558.00
12/8
Robin Trower
125.00
1,810.00
12/10
Queen
125.00
125.00
1,488.00
12/17,
12/18
Neil Diamond
250.00
250.00
2,304.00
2/25
Country Shindig
75.00
3/18
Dramatics
125.00
4/3
Jacksons
125.00
4/3
New Earth Concert
50.00
5/1
Pink Floyd
125.00
5/22
Led Zepplin
125.00
6/12
Heart
125.00
7/9
Commodores
125.00
7/17
James Brown
125.00
8/3
Waylon Jennings
125.00
8/4
Isley Brothers
125.00
11/12
Ashford & Simpson
125.00
11/14
Dramatics
125.00
12/28
Willie Nelson
125.00
12/30
Royes Royce
125.00
12/31
ZZ Top
200.00
2/19
(Unknown)
350.00
4/15
Statler Bros. &
Tammy Wynette [4]
35.00
155.00
8/19
Steve Miller
125.00
1,810.00
12/8
Patti Labelle
330.00
1978 CONCERTS
1/13
Kansas
$125.00
$125.00
$1,922.00
2/24
Loretta Lynn
75.00
730.00
3/17,
3/18
Foghat
250.00
4,442.00
4/15
Beach Boys
125.00
125.00
1,843.00
5/5
John Denver
100.00
100.00
912.00
6/12
Shaun Cassidy
125.00
125.00
1,857.00
8/18
Blue Oyster Cult
125.00
125.00
2,102.00
9/1
Electric Light
Orchestra
125.00
1,934.00
9/28
Foreigner
125.00
1,857.00
10/1
Yes
125.00
2,046.00
10/20
Merle Haggard
[5]
75.00
887.00
11/4
Styx
125.00
1,875.00
11/24
Bob Dylan
125.00
125.00
1,857.00
12/6
Moody Blues
125.00
125.00
1,857.00
1/8
Kenny Rogers
100.00
1/12
Earth, Wind & Fire
125.00
2/18
Barry White
125.00
2/23
Johnny Mathis
50.00
3/16,
3/17,
3/18
O'Calcutta
120.00
3/25
Burch
125.00
4/16
Parliament
125.00
4/19
Tom Jones
125.00
5/19
Bootsy's Rubber Band
125.00
6/11
O'Jays
125.00
6/18
Tom T. Hall
75.00
7/8
Commodores
125.00
7/16
Gladys Knight
125.00
8/26
James Brown
100.00
9/23
Teddy Pendergrass
125.00
12/2
Aerosmith
125.00
12/30
Willie Nelson
125.00
1/14
Jackson Browne
125.00
1,824.00
3/4
Lawrence Welk
50.00
344.00
3/21
Santana & Bob Welch
2,102.00
4/17
Pat & Debbie Boone
594.00
4/29
(Unknown) [6]
60.00
510.00
*133 The Commissioner proceeded to calculate Mr. Stevens' currency gross receipts by adding together the gross security fees confirmed by the promoters (excepting the confirmation for the Charlie Pride concert of September 24, 1977, which the Commissioner overlooked), regardless of whether the confirmed event appeared on the currency worksheets. The confirmed gross receipts totaled $39,591.83 in 1977 and $31,495.00 in 1978. He then estimated the petitioner's gross receipts from unconfirmed events by computing, for confirmed events, the percentage of the gross security *134 fees that the petitioner had reported on his currency worksheets as his supervisor's fees. Separate percentages were calculated for 1977 and for 1978 and for events for which the petitioner had reported receiving supervisor's fees of $75, $100, and $125. [7] The fees which the petitioner listed for unconfirmed events were then divided by the appropriate percentage to arrive at an estimate of the petitioner's gross receipts for the unconformed events. [8] the Commissioner added the gross receipts so imputed ($28,589.91 in 1977 and $28,520.00 in 1978) to the confirmed gross receipts and, for 1977, to the $3,800.00 fee paid to Mr. Stevens by the defense attorneys. He thus determined that Mr. Stevens had currency gross receipts of $71,981.74 in 1977 and $60,015.00 in 1978. *135 In his notice of deficiency, the Commissioner allowed deductions of $30,777.50 in 1977 and $35,180.17 in 1978 for payments to police officers who assisted Mr. Stevens. Such amounts were determined by adding the payments made to police officers by check ($26,827.50 in 1977 and $31,796.75 in 1978) to the cash payments that the revenue agent was able to verify through telephone calls to five police officers ($3,950.00 in 1977 and $3,383.42 in 1978). The parties have stipulated to the admission of affidavits from 13 police officers. If called to testify, 11 of such officers would state that they received from Mr. Stevens a total of about $8,525.00 in cash in 1977 and a total of about $8,170.00 in cash in 1978, and 2 officers would state that they received a total of $4,559.50 in cash or check in 1977 and a total of $3,718.00 in cash or check in 1978. The parties now agree that Mr. Stevens had deposited gross receipts, before payments by check to officers, of $45,201.77 in 1977 and $45,067.02 in 1978, although the petitioners maintain that such deposited gross receipts included currency receipts that the petitioners deposited into their bank accounts. OPINION The first issue for *136 decision is whether Mr. Stevens realized income from providing security services during the taxable years 1977 and 1978 in excess of the amounts reported by him from this source on his returns for those years, and if so, the amounts thereof. The Commissioner has determined the gross security fees paid to Mr. Stevens by check and in cash during the years in issue through a combination of the bank deposits method and a more unusual percentage method. The Commissioner maintains that the gross security fees so determined are includable in the petitioner's gross receipts from security services, and he has allowed deductions for payments to the police officers who assisted Mr. Stevens in providing security only to the extent that Mr. Stevens paid the officers by check or the officers told the Commissioner's revenue agent that they were paid in cash. A presumption of correctness attaches to the Commissioner's determination, and the taxpayer bears the burden of overcoming such presumption and proving that the determination is erroneous. Rule 142(a), Tax Court Rules of Practice and Procedure[9]; *137 Cracchiola v. Commissioner,643 F.2d 1383, 1385 (9th Cir. 1981), affg. per curiam a Memorandum Opinion of this Court; Marcello v. Commissioner,380 F.2d 494 (5th Cir. 1967), affg. on this issue a Memorandum Opinion of this Court; Harper v. Commissioner,54 T.C. 1121, 1129 (1970). We shall separately address the petitioners' objections to the Commissioner's determinations under the bank deposits method and the percentage method.
The Commissioner applied a bank deposits method to determine the amount of the gross security fees paid to Mr. Stevens by check and deposited into the petitioners' bank accounts. The parties now agree that Mr. Stevens deposited security fees of $45,201.77 in 1977 and $45,067.02 in 1978. After subtracting the amounts which Mr. Stevens paid to assisting police officers by check, stipulated amounts, the bank deposits method reflects that Mr. Stevens had deposited net income from security services of $18,324.27 in 1977 and $13,270.27 in 1978. Of such amounts, $11,066.00 was reported on the petitioners' original 1977 return *138 and $8,971.00 was reported on their 1978 return. The petitioners have made no objection to the Commissioner's bank deposits determination on brief, but at trial, the petitioners' counsel offered an exhibit presenting the petitioners' own bank deposits calculation which indicates that they believe that any difference between the deposited gross receipts and the reported gross receipts was attributable to deposits of Mr. Steven's unreported cash income from security services, and not to additional unreported income from promoters that paid by check. Under the Commissioner's method, the entire difference is attributed to unreported non-cash income. We have examined the deposits to the petitioners' bank accounts and are persuaded that unexplained [10] cash deposits must be excluded from the Commissioner's calculation of the petitioner's unreported income from promoters that paid by check. Unless the cash deposits are excluded, Mr. Stevens' income from promoters that paid in cash will be double-counted under the Commissioner's percentage method, for there is no evidence that the petitioners received unreported cash income from sources other than Mr. Stevens' security services and his *139 investigation for the defense attorneys. Therefore, we conclude that cash deposits totaling $1,710 in 1977 and $150 in 1978 must be excluded from the bank deposits calculations. In all other respects, the Commissioner's calculation, by means of the bank deposits method (as modified by his concession), of Mr. Stevens' deposited, non-cash income from security services is upheld. The primary dispute between the parties concerns the Commissioner's percentage method of calculating Mr. Stevens' income from promoters that paid in cash. The Commissioner added estimated (as determined by the percentage method described in our findings *140 of fact) and confirmed gross security fees paid in cash to arrive at the amounts of Mr. Stevens' gross receipts in 1977 and 1978. Although his revenue agent knew that Mr. Stevens employed and paid police officers to assist in providing security at the cash-paid events, the Commissioner has allowed deductions for cash payments to officers of only $3,950.00 in 1977 and $3,383.42 in 1978 because only those amounts were substantiated by recipient officers during the examination of the petitioners' returns. The Commissioner may determine the existence and amount of unreported income by any method that will, in his opinion, clearly reflect the taxpayer's income. Sec. 446(b); see Holland v. United States,348 U.S. 121, 130-132 (1954); Campbell v. Guetersloh,287 F.2d 878, 880 (5th Cir. 1961); Davis v. Commissioner,239 F.2d 187, 189 (7th Cir. 1956), affg. a Memorandum Opinion of this Court. The Commissioner is not limited to any particular method of reconstructing income ( Campbell v. Guetersloh,supra), and where the *141 taxpayer has maintained no books and records, the Commissioner need not compute the net income of the taxpayer with mathematical exactness. Harris v. Commissioner,174 F.2d 70, 73 (4th Cir. 1949), affg. per curiam a Memorandum Opinion of this Court; Gordon v. Commissioner,63 T.C. 51, 73 (1974), modified by 63 T.C. 501 (1975), affd. per curiam on this issue 572 F.2d 193 (9th Cir. 1977); Harbin v. Commissioner,40 T.C. 373 (1963). The petitioners contend that the Commissioner's determination was arbitrary, unreasonable, excessive, and thus invalid, that it is therefore to be accorded no presumption of correctness, and that we give it no effect. They rely on Helvering v. Taylor,293 U.S. 507 (1935), and Keneipp v. United States,184 F.2d 263 (D.C. Cir. 1950). Alternatively, they argue that they have proven that they are entitled to substantial additional deductions for payments to officers who assisted Mr. Stevens in providing security at the concerts. The petitioners bear the burden of proving that the determination was arbitrary (i.e., without rational foundation *142 in fact and based upon unsupported assumptions) and excessive before it will not be accorded the presumption of correctness. Gordon v. Commissioner,63 T.C. at 73. We conclude that the petitioners have not carried such burden. Here, because of Mr. Stevens' failure to keep records of his income from security services, the Commissioner's agent was compelled to reconstruct Mr. Stevens' income from the known facts available to him. He sought confirmations from all promoters of concerts at the convention center, and based on the information that he received, he employed a percentage method to estimate the gross security fees paid to Mr. Stevens for unconfirmed events in 1977 and 1978. Although the Commissioner's method necessarily involved some degree of approximation, we do not think his determination was arbitrary, in the sense of being capricious; nor do we think the method of reconstruction used by the Commissioner was unreasonable or invalid under the circumstances. Cf. Anderson v. Commissioner,250 F.2d 242 (5th Cir. 1957), affg. a Memorandum Opinion of this Court. The petitioners argue that the Commissioner was arbitrary in determining *143 that the gross security fees, rather than just the supervisor's fees, were gross receipts and, thus, gross income to Mr. Stevens. However, the petitioners have presented very little evidence and no legal argument to support their assertion. Although Mr. Stevens apparently entered into no written contracts with the promoters or with the convention center, he was the person designated under contracts between the convention center and promoters to be contacted for security services. Mr. Stevens had control over the hiring of the officers that worked at the concerts. Mr. Stevens may have considered himself to be merely a conduit for the payments from the promoters to the officers, but the petitioners have presented insufficient evidence and argument to persuade us that such was in fact the case. The petitioners further argue that the Commissioner was arbitrary and excessive in allowing deductions for cash payments to officers only to the extent that, during the examination of the petitioners' returns, recipient officers verified their receipt of cash. However, the petitioners bear the burden of proving their entitlement to such deductions [11] ( New Colonial Ice Co. v. Helvering,292 U.S. 435, 440 (1934)), *144 and the Commissioner was not arbitrary in requiring them to substantiate the expense. Although the petitioners have not proven that the Commissioner's determination of Mr. Stevens' taxable income was arbitrary or excessive, we nevertheless believe that the petitioners have proven that Mr. Stevens' taxable cash income from security services was substantially less than that determined by the Commissioner. Mr. Stevens provided the Commissioner's revenue agent with currency worksheets listing the concerts for which he provided security in 1977 and 1978 and the amounts of the gross security fees retained by him as his supervisor's fees. With three exceptions, the amounts listed on the currency worksheets are consistent with the supervisor's fees specified in the invoices submitted to the promoters by Mr. Stevens *145 and made available by the promoters that confirmed payments to Mr. Stevens. Mr. Stevens testified that of the gross security fees paid by the promoters, he retained only the amounts billed as his supervisor's fee and that he promptly delivered the remainder to the assisting police officers. He further testified that he did not keep a record of the amounts that he paid or the names of the recipient officers because he thought that he had to report as his gross receipts only the amounts which he retained. We accept Mr. Stevens' testimony that he retained only his supervisor's fee. We found Mr. Stevens to be a credible witness, forthright in acknowledging the fact and the amounts of his unreported income (although he was somewhat vague as to his motive for filing an amended return), and his testimony was corroborated in several respects. Both the convention center manager and the president of a company that provided ticket and box office bookkeeping services to concert promoters confirmed that the promoters often counted the police officers present at a concert to insure that they were not billed for police services that they did not receive. Furthermore, there is no evidence that *146 Mr. Stevens paid the police officers less than he charged the promoters for the officers' services. The recollection of the two officers who testified at trial that they were paid about $6 or $7 an hour in 1977 and 1978 is consistent with the amounts billed for officers on the invoices submitted to promoters. Moreover, one of the officers testified that on one or two occasions he saw the invoice submitted to the promoter and that he received the amount billed on such invoices for his services. The stipulated affidavits secured by the petitioners from 13 officers also support Mr. Stevens' testimony that he retained only his supervisor's fees. The affidavits reveal that Mr. Stevens paid the officers substantial amounts of cash in 1977 and 1978. We may safely assume that a substantial amount more was paid to officers other than the 13 who executed affidavits since most of the concerts at issue were rock, pop, or rhythm and blues concerts, requiring the services of 40 officers (including Mr. Stevens), and since the same 40 officers could not always have been available. The Commissioner objects to the contents of the affidavits on the grounds that the affiants may have been paid by *147 check rather than in cash and that the affidavits are "lacking trustworthiness" because they were executed after the expiration of the statute of limitations governing the assessment and collection of deficiencies against the officers. Neither objection is persuasive. First, the affidavits explicitly asked the officers to specify the amounts that they received in cash, and the officers who were uncertain as to the amounts received in cash or by check did not hesitate to alter the language of the affidavits to so indicate. We also observe that the affiants were police officers and, therefore, presumably familiar with the need to review an affidavit carefully before executing it. Second, that the statute of limitations may have expired, barring the assessment of deficiencies against them, is more an incentive to truthfulness than otherwise. Having rejected the Commissioner's determination of Mr. Stevens' cash income from furnishing security services at the concerts, we must next decide how such income is to be determined. Under the rule of Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930) (see Goldsmith v. Commissioner,31 T.C. 56 (1958)[12]), *148 we could determine Mr. Stevens' net cash income by reducing the Commissioner's estimate of Mr. Stevens' gross cash receipts by our own estimate of the amount of his payments to the police officers, but we believe that in the present case, a more accurate determination of his net cash income can be made on the basis of his currency worksheets. We find that Mr. Stevens had net cash income in the amounts and for the concerts listed thereon, but in addition, we find that he received net income for the following concerts, which were omitted from the currency worksheets but confirmed by the promoters: Supervisor's
Date
Event
Fee
2/19/77
Concert by an unknown artist
[13] $75
7/30/77
Ted Nugent concert
125
8/19/77
Steve Miller concert
125
12/8/77
Patti Labelle concert
[14] 75
1/14/78
Jackson Browne concert
125
3/4/78
Lawrence Welk concert
50
3/21/78
Santana and Bob Welch concert
[15] 125
4/17/78
Pat and Debbie Boone concert
[16] 75
10/20/78
Merle Haggard concert
75
Consequently, we conclude that Mr. Stevens received net cash income of $8,950 in 1977 (including the $3,800 that he received from the defense attorneys) and $4,070 in 1978. *149 The second issue for decision is whether any part of the underpayment of tax for the taxable years 1977 or 1978 was due to fraud within the meaning of section 6653(b). Such section provides that if any part of any underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. The Commissioner has the burden of proving, by clear and convincing evidence, that some part of the underpayment for each year was due to fraud. Sec. 7454(a); Rule 142(b); Levinson v. United States,496 F.2d 651, 654-655 (3d Cir. 1974); Otsuki v. Commissioner,53 T.C. 96, 105 (1969). To establish fraud, the Commissioner must show that the taxpayer intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of such taxes. Webb v. Commissioner,394 F.2d 366, 377-378 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Cefalu v. Commissioner,276 F.2d 122, 128 (5th Cir. 1960), *150 affg. a Memorandum Opinion of this Court; Mitchell v. Commissioner,118 F.2d 308, 310 (5th Cir. 1941), revg. on another issue 40 B.T.A. 424 (1939). The filing of an amended return for a year in issue that correctly reports the taxpayer's income does not bar a finding of fraud for the year if the original return was filed with fraudulent intent. Naples v. Commissioner,32 T.C. 1090, 1097 (1959); Hirschman v. Commissioner,12 T.C. 1223 (1949). The Commissioner need not prove the precise amount of underpayment resulting from fraud. Otsuki v. Commissioner,supra at 105. The statute requires only a showing that "any part" of an underpayment results from fraud. However, the Commissioner must show fraud resulting in an underpayment for each taxable year for which he claims the addition. Otsuki v. Commissioner,supra.
The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). In the present *151 case, the record clearly and convincingly establishes that some part of the underpayment in 1977 and in 1978 was due to fraud on the part of the petitioners. By his own admission, Mr. Stevens, a police officer, intentionally failed to report his currency income in 1977 and 1978 even though he knew that such currency was income and that he had a duty to report it. He testified that he did not report the cash income because he had spent the money and did not have the money to pay the tax due, and that he intended to report the income eventually, but we are convinced that Mr. Stevens was not intending merely to postpone the payment of the tax. [17] The fact that he reported his income from promoters that paid him by check but failed to report his income from those who paid him in cash is a clear indication that he intended to conceal the cash income.Furthermore, it is highly suspicious that the petitioners filed an amended return reporting the bulk of their cash income just a few days after a newspaper reported that Mr. Stevens had received cash payments from the defense attorneys: such action indicates that the petitioners decided to report the cash income only after Mr. Stevens' receipt *152 of it became public. The petitioners' failure to maintain records of Mr. Stevens' income from security services is also some evidence of fraud. Harper v. Commissioner,54 T.C. 1121, 1141 (1970); Otsuki v. Commissioner,supra at 110. We are also unpersuaded by the petitioners' assertion that Mr. Stevens' several heart attacks during the years in issue prevented them from reporting all of their income or prevented them from forming the necessary fraudulent intent. Such assertion does not explain why Mr. Stevens felt well enough to report his non-cash income or why Mrs. Stevens was unable to accurately report the petitioners' income. On the record before us, we hold that the Commissioner has proven by clear and convincing evidence that some part of the underpayment of tax for both 1977 and 1978 was due to fraud within the meaning of section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
2. The Commissioner's computation of the petitioner's unreported gross receipts may be summarized as follows: ↩
1977
1978
Gross receipts as determined
Deposited
$ 52,855.66 $ 40,632.78 Currency
71,981.74 60,015.00 $124,837.40 $100,647.78 Less: Gross receipts
reported on original 1977
return and 1978 return
(11,066.00)
(8,971.00)
Unreported gross receipts
$113,771.40 $ 91,676.78 3. In addition to the special account, the petitioners had a personal checking account and a savings account in 1977 and 1978.↩
4. According to the promoter's confirmation letter, the Statler Brothers/Tammy Wynette concert took place at the Will Rogers Coliseum, not at the convention center. In addition, the invoice submitted to the promoter was signed by someone other than Mr. Stevens or his assistant suprevisor, Mr. Russell. ↩
5. The petitioner listed the Merle Haggard concert on the currency worksheets but did not list his fee for the concert. ↩
6. The April 29, 1978, concert took place at the Will Rogers Coliseum, not at the convention center. The invoice submitted to the promoter was signed by someone other than Mr. Stevens or Mr. Russell.↩
7. The Commissioner computed the percentages as follows: 1977
19 dates at $125 per date (the Commissioner overlooked the June 21 concert by Aerosmith and the July 30 concert by Ted Nugent)-- Total supervisor's fees per currency worksheets: $2,375.00 Confirmed gross security fees: $35,288.83 Percentage: $2,375.00 / $35,288.83 = 6.7303% 3 dates at $75 per date (the Commissioner overlooked the Sept. 24 concert by Charlie Pride)-- Total per currency worksheets: $225.00 Confirmed gross security fees: $1,658.00 Percentage: $225.00 / $1,658.00 = 13.5706% 1978
12 dates at $125 per date-- Total per currency worksheets: $1,500.00 Confirmed gross security fees: $23,592.00 Percentage: $1,500.00 / $23,592.00 = 6.3581% 1 date at $75 per date-- Total per currency worksheets: $75.00 Confirmed gross security fees: $730.00 Percentage: $75.00 / $730.00 = 10.274% 2 dates at $100 per date (the Commissioner treated the Oct. 20 concert by Merle Haggard as one which the petitioner listed at $100 on the currency worksheets) Total per currency worksheets: $200.00 Confirmed gross security fees: $1,824.00 Percentage: $200.00 / $1,824.00 = 10.9649% ↩
8. The Commissioner computed the gross receipts for security services from the unconfirmed events listed on the currency worksheets in the following manner: 1977
13 unconfirmed events listed on currency worksheets at $125.00 per date-- Total of supervisor's fees per currency worksheets: $1,625.00 Applicable percentage: 6.7303% Estimated gross receipts for security services: $1,625.00 / 6.7303% = $24,144.54 2 unconfirmed events listed on currency worksheets at $75.00 per date (the Commissioner mistakenly counted the Sept. 24 Charlie Pride concert as unconfirmed)-- Total per currency worksheets: $150.00 Applicable percentage: 13.5706% Gross receipts: $150.00 / 13.5706% = $1,105.33 1 unconfirmed event listed on currency worksheets at $50.00 per date-- Gross receipts: 50/75 X ($75.00 / 13.5706%) = $368.44 1 unconfirmed event listed on currency worksheets at $200.00 per date-- Gross receipts: 200/125 X ($125.00 / 6.7303%) = $2,971.64 1978
12 unconfirmed events listed on currency worksheets at $125.00 per date-- Total per currency worksheets: $1,500.00 Applicable percentage: 6.3581% Gross receipts: $1,500.00 / 6.3581% = $23,592.00 1 unconfirmed event listed on currency worksheets at $75.00 per date-- Total per currency worksheets: $75.00 Applicable percentage: 10.274% Gross receipts: $75.00 / 10.274% = $730.00 2 unconfirmed events listed on currency worksheets at $100.00 per date-- Total per currency worksheets: $200.00 Applicable percentage: 10.9649% Gross receipts: $200.00 / 10.9649% = $1,824.00 1 unconfirmed event listed on currency worksheets at $50.00 per date-- Gross receipts: 50/75 X ($75.00 / 10.274%) = $487.00 1 unconfirmed event listed on currency worksheets at $120.00 per date-- Gross receipts: 120/125 X ($125.00 / 6.3581%) = $1,887.00↩
9. Any reference to a rule is to the Tax Court Rules of Practice and Procedure.↩
10. Not all of the cash deposits can be attributed to deposits of Mr. Stevens' cash income from security services. Mrs. Stevens testified that her wages were the source of two cash deposits in 1977, and from our own examination of the deposits, we find that Mrs. Stevens' wages and Mr. Stevens' retirement pay were the source of $4,462.34 of cash deposits in 1978. Furthermore, we have treated all ambiguous cash deposit slips (e.g., amount of deposit listed on "currency" line but "currency" crossed out) as reflecting deposits of checks rather than cash.↩
11. Contrary to the petitioners' contention, the payments to the officers are not a cost of goods sold because Mr. Stevens was in a service business, not a merchandising, mining, or manufacturing business. Sec. 1.61-3(a), Income Tax Regs. The petitioners' reliance on Rubin v. Commissioner,T.C. Memo. 1954-213↩, is misplaced.
12. Ball v. Commissioner,T.C. Memo. 1982-474; Prince v. Commissioner,T.C. Memo. 1954-214↩. 13. The promoter's confirmation of the Feb. 19, 1977, concert by the unknown artist did not specify the amount paid to the police supervisor, and therefore, we have determined that Mr. Stevens received $75 as his supervisor's fee since he received that amount for other concerts where the gross security fee was of about the same amount as that of the Feb. 19, 1977, concert (i.e., $350). ↩
14. The supervisor's fee was determined in the same manner as that for the Feb. 19, 1977, concert by the unknown artist. See n. 13. ↩
15. The promoter's confirmation of the March 21, 1978, Santana and Bob Welch concert did not specify the amount paid to the police supervisor, and therefore, we have determined that Mr. Stevens received $125 as his supervisor's fee since he received that amount for other concerts where the gross security fee was of about the same amount as that of the March 21, 1978, concert (i.e., $2,012). ↩
16. The supervisor's fee was determined in the same manner as that for the Feb. 19, 1977, concert by the unknown artist. See n. 13.↩
17. Cf. Morrell v. Commissioner,T.C. Memo. 1971-99↩.